Steven D. DREYER and Roberta
M. Dreyer, Plaintiffs,

v.

RYDER AUTOMOTIVE CARRIER
GROUP, INC., Ryder Automotive Op-
erations, Inc. d/b/a Delavan, Delavan
Industries, Inc., Ryder System, Inc.
and Ryder Automotive Carrier Ser-
vices, Inc., Defendants.

No. 98–CV–0082A.

United States District Court,
W.D. New York.

April 14, 2005.

Marcus Andreozzi & Fickess, LLP, Attorneys for Plaintiffs, David P. Marcus, of Counsel, Amherst.

Larson & Larson, P.C., Attorneys for Defendants, David E. Larson, of Counsel, Leawood, KS.

Hiscock & Barclay, LLP, Attorneys for Defendants, Samuel J. Burrano, Jr., of Counsel, Buffalo.

## DECISION AND ORDER

ARCARA, Chief Judge.

### *INTRODUCTION*

Plaintiffs Steven and Roberta Dreyer brought this action in products liability alleging that the defendants' autohauler is defectively designed because it lacks a fall protection system. Steven Dreyer ("Dreyer") operated the autohauler and during the unloading process he fell from the upper level and sustained several injuries for which he seeks compensation. Roberta Dreyer seeks damages for loss of consortium. Defendants contend that the autohauler is not defectively designed, that it is reasonably safe, that no alternative, safer designs are feasible and that Dreyer's own negligence was the cause of his fall. This matter is scheduled for jury trial to commence on April 18, 2005.

### *BACKGROUND*

Pending before the Court are several motions concerning the admissibility of expert testimony at trial, including defendants' objections to the Magistrate Judge's Decision and Order disqualifying defendants' expert, Dr. Charles Proctor ("Proctor"), defendants' motion to file Dr.

Proctor's supplemental expert report, defendants' motion to disqualify plaintiffs' expert, Linda Weseman ("Weseman"), and defendants' motion to strike Weseman's supplemental expert reports. Defendants also filed several procedural motions relating to these substantive motions.

## DISCUSSION

### A. Objections to Decision and Order Disqualifying Defendants' Expert

The Magistrate Judge's Decision and Order concerns a non-dispositive motion and will not be reversed by this Court unless it is "clearly erroneous or contrary to law." *See* 28 U.S.C. § 636(b)(1)(A); *Nikkal Industries, Ltd. v. Salton, Inc.*, 689 F.Supp. 187, 189 (S.D.N.Y.1988) (Magistrate's conclusions on motion to disqualify expert witness subject to the "clearly erroneous or contrary to law" standard of review). A finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

On July 27, 2002 plaintiffs filed a motion to exclude Proctor's expert opinions. On February 9, 2005 Magistrate Judge Leslie G. Foschio issued a Decision and Order in which he concluded that Proctor's opinions should be excluded because defendants failed to show (1) that Proctor was qualified to opine on whether the autohauler was negligently designed and whether Dreyer's negligence caused his injuries; (2) that Proctor's conclusions are relevant to the issues before the jury; and (3) that Proctor had a technical basis for his conclusions and that his conclusions are based on reliable facts and data as required by Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

On March 1, 2005 defendants filed a document which asserts objections to and seeks reconsideration of the Magistrate Judge's February 9, 2005 Decision and Order. However, a review of the document reveals no request for reconsideration except that made in the title of the document. The document is an appeal to this Court of the Magistrate Judge's ruling, and it has been treated as such. Plaintiffs oppose defendants' objections, arguing that the objections are untimely and that defendants fail to demonstrate that the Magistrate Judge's decision is clearly erroneous or contrary to law.

#### 1. Timeliness of the Objections

The Magistrate Judge's Decision and Order was issued on February 9, 2005. Defendants filed their objections on March 1, 2005. Plaintiffs argue that the objections are untimely and should not be considered.

Plaintiffs are correct. Rule 72 of the Federal Rules of Civil Procedure provides that objections to a Magistrate Judge's Decision and Order are to be filed "[w]ithin 10 days after being served with a copy of the ... order." Fed.R.Civ.P. 72(a). The 10 days available pursuant to Rule 72 are business days since Rule 6(a) of the Federal Rules of Civil Procedure excludes weekends and legal holidays from the computation of filing periods less than 11 days in length.

> In computing any period of time prescribed or allowed by these rules ... [w]hen the period ... prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.

Fed.R.Civ.P. 6(a).

The Advisory Committee Notes to Rule 72 indicate that the 10–day period is

subject to Rule 6(e) of the Federal Rules of Civil Procedure which provides:

> Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper [is] served upon the party [by mail], 3 days shall be added to the prescribed period.

The additional three days provided for under Rule 6(e) are calendar days, not business days, and are added after the calculation of the 10 days pursuant to Rule 6(a). *See Treanor v. MCI Telecom. Corp.,* 150 F.3d 916, 918–19 (8th Cir.1998); *CNPq–Conselho Nacional de Desenvolvimento Cientifico e Technologico v. Inter-Trade, Inc.,* 50 F.3d 56, 58–59 (D.C.Cir. 1995); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir. 1993).

In this case, the Magistrate Judge's Decision and Order was filed and sent to the parties on February 9, 2005. Under Rule 72 and Rule 6(a), the 10–day period would have expired on February 24, 2005. Adding the three additional days under Rule 6(e), defendants' objections would have been due on February 27, 2005. However, because that day fell on a Sunday, the objections were due the next business day, Monday, February 28, 2005. *See* Fed. R.Civ.P. 6(a); *Golden Nugget, Inc. v. Chesapeake Bay Fishing Co.,* 232 F.Supp.2d 631, 634 (E.D.Va.2002).

Defendants' objections were not filed until March 1, 2005, and thus they are untimely.[1]

### 2. *Decision and Order Not Clearly Erroneous or Contrary to Law*

Even if the defendants' objections had been timely filed, the Court concludes that defendants failed to demonstrate that the Magistrate Judge's decision is clearly erroneous or contrary to law. Defendants' objections are 47 pages in length, and consist of excerpts, without page references, from the Magistrate Judge's 60 page Decision and Order followed by defendants' arguments as to why the excerpted portions are erroneous. Defendants' challenge the Magistrate Judge's decision with respect to Proctor's qualifications, methodology and the relevance of his opinions to the issues that will confront the jury in this case.

The Magistrate Judge concluded that although Proctor is well-credentialed, he lacks qualification or experience relevant to autohaulers such that his opinions go beyond the scope of his area of expertise. As both the Magistrate Judge and defendants note, a review of an expert's qualifications should not be so narrow as to limit the source of experts to only those persons with direct experience in the relevant industry. *See Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 81 (2d Cir.1997). However, an expert may opine on matters "within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline." *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227–28 (N.D.N.Y.1994). An otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain

---

1. On March 31, 2005, defendants belatedly filed a motion for a one day extension of time to object to the Magistrate Judge's Decision and Order which, if granted, would render their objections timely filed. As the Court concludes that the defendants' objections should be denied on their merits as well as on timeliness grounds, the motion for an extension of time is denied as moot. Defendants' March 10, 2005 motion for leave to file objections in excess of the page limits is granted.

the technical basis for his opinion. *See Mannix v. Chrysler Corp.*, No. 97–CV–1944, 2001 WL 477291 (E.D.N.Y. March 4, 2001).

■ A review of Proctor's report indicates that he has extensive education, experience, and teaching experience in mechanical engineering. He has acted as an expert witness many times in the past, and on two prior occasions, in cases concerning injuries during the loading and unloading of autohaulers. He states that he has loaded, unloaded and operated a fully loaded autohauler and has received training in those tasks from Ryder personnel. The Court concludes that, as defendants argue, Proctor has the objective credentials and experience, albeit not directly related to fall protection systems on autohaulers, to qualify him as an expert to testify as to the existence of a design defect. As the Magistrate Judge noted, however, Proctor failed to articulate the technical or scientific basis for his conclusions.

■ Rule 702 of the Federal Rules of Evidence provides that

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Proctor, in his report and as amplified by his deposition testimony, opined that the autohauler was appropriately designed and not defective because Dreyer could have safely loaded and unloaded the vehicles on the autohauler as currently designed. He also concluded that, since the design of the autohauler

was appropriate, it was not necessary to assess the foreseeability of Dreyer's use of the autohauler, i.e., loading the van front end first and approaching it from the ramps to unload it. Proctor failed, however, to explain the technical basis for his conclusions. Proctor's conclusions regarding the absence of defect may well have been based on his education, training and experience as an engineer. However, his failure to explain why his training and experience led him to his conclusion is the reason why his opinion cannot be accepted. Without explaining the reasoning behind his conclusion, as the Magistrate Judge noted, the Court is left with the mere *ipse dixit*, or say so, of the expert. His use of statistical evidence to support his conclusion was also not reliable. Defendants argue that Weseman, plaintiffs' expert, verified that Proctor's statistical method was acceptable. However, the pages of Weseman's deposition in another case which defendants cite indicate that in fact, Weseman did not accept Proctor's method of comparing the number of injuries to the number of "exposures." Weseman described such an approach as "inappropriate."

■ Finally, the Magistrate Judge concluded that Proctor's opinions as to Dreyer's negligence would not assist the jury because Proctor's opinions were based in large part on common sense and facts which would be obvious to any reasonable adult. Defendants have not demonstrated that the Magistrate Judge's decision is clearly erroneous or contrary to law. Therefore, defendants' objections to the Magistrate Judge's Decision and Order are denied.

**B. *Defendants' Motion to Supplement Proctor's Expert Report***

■ Defendants seek to supplement Proctor's initial expert report in order to

address some of the Magistrate Judge's concerns and to address some of the conclusions reached by plaintiffs' expert in her supplemental reports. Plaintiffs object, arguing that defendants cannot rehabilitate Proctor's opinions now that they have been excluded by the Magistrate Judge.

Defendants' motion is denied as untimely. Proctor's supplemental report is dated March 1, 2005, three weeks after the Magistrate Judge issued his Decision and Order disqualifying Proctor as an expert witness in this matter. Plaintiffs' motion to disqualify Proctor was filed in July, 2002. No attempt was made to supplement Proctor's report for over 2½ years. Defendants' have failed to cite any authority allowing a disqualified expert to supplement his report in order to meet the requirements of Rule 702 of the Federal Rules of Evidence and *Daubert.* Proctor's second reason for the supplement, specifically to address the conclusions reached in plaintiffs' expert's supplemental reports, is equally unavailing. In his original report, Proctor stated that he had reviewed Weseman's original and first supplemental report. Therefore, Proctor could have rebutted Weseman's conclusions in his original report. Weseman's other two supplemental reports were issued in November 2003 and in January 2005, but defendants made no application to supplement Proctor's report at those times. Despite having several opportunities to supplement Proctor's report, defendants waited until 48 days prior to trial to seek leave to do so. The Court cannot countenance such delay. Defendants' motion is denied.

### C. *Defendants' Motion to Disqualify Weseman as Plaintiffs' Expert*

On March 14, 2005, defendants, for the first time, challenged the qualifications and opinions of plaintiffs' expert Weseman by motion to disqualify her as an expert in this matter. Defendants contend that, based on the reasons cited by the Magis-

trate Judge for the disqualification of Proctor, Weseman's opinions and testimony should also be excluded. Plaintiffs counter that the Magistrate Judge had compared Weseman's report and testimony favorably to Proctor and that Weseman's education and experience in the autohauling industry renders her qualified to opine on the defect in the autohauler and on feasible alternatives.

Weseman submitted her original expert report in this matter on November 1, 2000, over four years ago. Despite their awareness of Weseman's credentials and methodology since that time, and despite their awareness of the basis for plaintiffs' motion to disqualify Proctor since July 2002, defendants waited until 35 days prior to commencement of the trial to attack Weseman's qualifications. If the defendants believed Weseman was not qualified to act as an expert in this matter, it was incumbent upon them to make a timely motion to disqualify her. Defendants' motion is untimely and it is denied.

### D. *Motion to Strike Weseman's Supplemental Reports*

On March 1, 2005, defendants filed a motion seeking to strike supplemental reports which were submitted by Weseman over the past several years. Weseman's original report was dated November 1, 2000. Her first supplemental report was dated April 27, 2001, her second supplemental report was dated November 4, 2003 and her third supplemental report was dated January 18, 2005. Defendants contend that the supplemental reports were filed after the deadline for completion of discovery and without leave of Court. Plaintiffs argue that the reports should not be stricken because by submitting supplemental reports, plaintiffs were merely fulfilling their obligation to supplement their

disclosures pursuant to Rule 26(e) of the Federal Rules of Civil Procedure.

Defendants' motion is denied. Defendants were provided with Weseman's supplemental reports at the time she drafted them. Defendants could have and should have raised objection to the supplemental reports at the time they were served. The motion is untimely and is denied.

## CONCLUSION

For the reasons stated above, defendants' objections to the Magistrate Judge's February 9, 2005 Decision and Order are denied; defendants motion for leave to supplement Proctor's expert report is denied; defendants' motion to disqualify plaintiffs' expert is denied; and defendants' motion to strike the supplemental reports of plaintiffs' expert is denied. Also, defendants' motion to file objections in excess of the page limits is granted and defendants' motion for a one day extension of time to file objections is denied as moot.

IT IS SO ORDERED.

## JURISDICTION

This matter was referred to the undersigned by Hon. Richard J. Arcara for all pretrial matters on March 31, 1998 (Doc. No. 13). It is presently before the court on Plaintiffs' Motion to Exclude the Opinions of Defendants' Expert (Doc. No. 92).

## BACKGROUND

This products liability action alleging defective design of a multi-vehicle autohauler was commenced February 2, 1998. Plaintiffs' motion to exclude the testimony of Defendants' designated expert witness Charles L. Proctor, II, Ph.D. ("Proctor"),

was filed on July 26, 2002 ("Plaintiffs' Motion"), with the supporting affidavit of David P. Marcus, Esq., dated July 26, 2002 (Doc. No. 94) ("Marcus Affidavit") along with Exhibits A—V ("Plaintiffs' Exhibit(s) ____"), a video tape ("Plaintiffs' Exhibit S"), and a Memorandum of Law in Support of Plaintiffs' Motion to Exclude (Doc. No. 93) ("Plaintiffs' Memorandum").

Defendants opposed Plaintiffs' Motion by filing, on October 2, 2002, the Declaration of Samuel J. Burrano, Jr., Esq., dated October 2, 2002 ("Burrano Declaration") (Doc. No. 101) together with Exhibits A—D ("Defendants' Exhibit(s) ____"), and a Memorandum of Law in Opposition to Plaintiffs' Motion to Exclude Expert Testimony (Doc. No. 102) ("Defendants' Memorandum").

On October 23, 2002, Plaintiffs filed the Affidavit of David P. Marcus, Esq. in further support of Plaintiffs' motion, attaching Plaintiffs' Exhibits W—X, together with Plaintiffs' Reply Memorandum of Law (Doc. No. 106) ("Marcus Reply Affidavit") ("Plaintiffs' Reply Memorandum"). On June 4, 2003, Plaintiffs submitted a letter to the court submitting additional authority in further support of Plaintiffs' Motion. Oral argument was deemed unnecessary. For the following reasons, Plaintiffs' Motion is GRANTED.[1]

## FACTS [2]

On February 27, 1997, Plaintiff, Steven Dreyer ("Dreyer"), slipped and fell from the left side of the upper-level of a Model 3200 tractor-trailer assembled by Defendant Delavan Industries and used to transport cars, light trucks, and minivans ("the

1. A motion to disqualify a prospective testifying expert is non-dispositive in nature and subject to review as clearly erroneous or contrary to law. *Nikkal Industries, Ltd. v. Salton, Inc.*, 689 F.Supp. 187, 189 (S.D.N.Y.1988) (motion to disqualify defense witness expected

to testify as an expert considered a non-dispositive motion under 28 U.S.C. § 636(b)(1)(A)).

2. Taken from the pleadings and papers filed in this action.

autohauler" or "the Model 3200"). The autohauler is comprised of a tractor unit or cab where the driver sits and a trailer on which loaded vehicles are transported. Defendants' Exhibit A; Plaintiffs' Exhibit B (Report of Charles L. Proctor, II, Ph.D., December 4, 2000) ("Proctor(s) Report") at 11, ¶ 1; Plaintiffs' Exhibit D (Report of Linda L. Weseman, P.E., November 1, 2002 ("Weseman(s) Report")) at 1–2.[3] The autohauler, a "modified" Model 3200, was capable of carrying up to twelve cars.[4] Proctor Report at 11, ¶ 5. Using a system of hydraulic devices and ramps, the Model 3200 enables the driver of the autohauler ("driver") to load two vehicles on an upper level, located above the tractor's cab, ("the headramp"), one vehicle below the headramp on the flat part of the trailer portion of the autohauler, and additional vehicles on the upper and lower levels of the trailer portion of the autohauler. Proctor Report at 1, ¶ 1; Weseman Report at 1, ¶ 3; Plaintiffs' Memorandum at 3; Plaintiffs' Exhibits A1—A2.

The accident giving rise to this action occurred while Dreyer was unloading six Chevrolet Astro minivans ("Astro minivan(s)" or "minivan(s)") at Defendant Ryder Automotive Carrier Services, Inc.'s Roanoke, Indiana facility near Ft. Wayne, Indiana, having previously loaded the minivans at Elkhart, Indiana, approximately an hour's drive away. Defendants' Exhibit B (ACD Supervisor's First Report of Injury); Proctor Report at 11, ¶ 6. After unloading the minivans from the first level of the autohauler, Dreyer positioned the No. 2 position ramp, on which Dreyer had loaded an Astro minivan front-end-first, to enable him to unload the minivan.[5] Proctor's Report at 12, ¶ 1; Plaintiffs' Exhibit E (Deposition of Steven D. Dreyer, March 15, 1999) ("Dreyer Deposition") at 73, 76; Plaintiffs' Exhibit A–3, A–4, A–5. Drivers can unload minivans from the Model 3200's headramp by walking up a ramp from the lower level of the autohauler's trailer to gain access to the driver's seat through the minivan's rear door, or by stepping along the side of the minivan on the ramp to gain access through the driver's side door. Plaintiffs' Exhibit K (Deposition of Timothy Vincent on September 28, 2000) ("Vin-

---

3. Proctor's Report refers to the instant litigation as *Dreyer v. GACS*. However, GACS is not a defendant in this action. Plaintiffs' Exhibit C, Deposition of Charles L. Proctor, II, Ph.D., May 30, 2001 (pp. 1–254); May 31, 2001 (pp. 255–438) ("Proctor Deposition") at 81. GACS Incorporated ("GACS") is the successor, by merger, of Defendants Ryder Automotive Carrier Group, Inc., Ryder Automotive Operations, Inc., d/b/a Delavan, Delavan Industries, Inc., and Ryder Automotive Carrier Systems, Inc. ("Defendants"). Affidavit of John E. Stanton, Jr., Esq. in Support of Defendants' Cross–Motion to Substitute GACS for Defendants, June 17, 1999 (Doc. No. 21) (Exhibits A–E) ("Stanton Affidavit"). On the date of the accident, Dreyer was employed by Commercial Carriers, Inc., ("CCI"), a wholly owned subsidiary of Defendant Ryder Automotive Operations, Inc. owned by Defendant Ryder Automotive Carrier Services, Inc., which is owned by Defendant Ryder System, Inc. Stanton Affidavit, ¶ 9. After the accident, CCI was purchased by Allied Holdings, Inc.

("Allied") August 20, 1997. Plaintiffs' Exhibit H. On February 5, 2003, the District Judge, Hon. Richard J. Arcara, denied Defendants' Motion to Substitute GACS for all Defendants, except Ryder System, Inc. (Doc. No. 114).

4. Although Proctor describes the Model 3200 as capable of transporting 12 cars, Proctor Report at 11, ¶ 5, a photograph of a fully loaded Model 3200 shows only eight autos (the photo actually depicts eight pick-up trucks) at full capacity. *See* Plaintiffs' Exhibit A–1.

5. The No. 2 position is actually considered as the No. 3 position by Defendant Delavan; however, for the purposes of the instant litigation, Plaintiffs and Defendants refer to it as the No. 2 position to remain consistent with Dreyer's description of it as the No. 2 position. Proctor Report at 1, ¶ 1. To avoid confusion, Proctor continued to refer to it as the "No. 2 position." Proctor Deposition at 287.

cent Deposition") at 28—30, 31, 34; Plaintiffs' Exhibit A–3.

An alternate, and, according to Defendants, the proper, means of reaching a minivan on the headramp is to climb to the headramp area using "foot brackets" located behind the cab. Defendants' Memorandum at 2–3; Plaintiffs' Memorandum at 4, n. 6; Plaintiffs' Exhibit A–8. However, according to Leo Ferguson, an experienced Model 3200 driver, such foot brackets, or "foot pegs," are limited to accessing a vehicle in the Model 3200's No. 1 position, i.e., a vehicle loaded on the headramp over the cab in front of a vehicle loaded in the No. 2 position, Plaintiffs' Exhibit A–8, as such "foot pegs" can only be safely used by the driver "to get the front one [the vehicle in the No. 1 position] off." Plaintiffs' Exhibit L (Deposition of Leo B. Ferguson, September 29, 2000) ("Ferguson Deposition") at 12 (bracketed material added). Ferguson testified that the foot brackets or pegs would be of "no help" in climbing up to the No. 2 position as "there are no foot pegs on the back of the trailer and you can't get in between Number 1 to get to Number 2, because it's just not enough room." [sic]. Id.; Plaintiffs' Exhibit A–9.

Vehicles are loaded on the No. 1 and No. 2 positions by extending the No. 2 position ramps using hydraulic devices, which lengthen the ramps to allow for loading of a vehicle by driving the vehicle up the ramp to the No. 1 or No. 2 position. Proctor Report at 12, ¶ 1. To accommodate the vehicle, the ramps forming the No. 2 position are horizontally extended by hydraulic pistons, and, as a result, the metal rod of the piston is exposed beyond the metal cover of the hydraulic unit. Vincent Deposition at 31–35; Plaintiffs' Exhibit F (Deposition of Peter J. Terzian, Jr., August 26, 1999 ("Terzian Deposition")) at 135; Plaintiffs' Exhibits A–2, A–4. According to Terzian, when extended the metal shaft of the piston rod is likely to be oily.[6] Terzian Deposition at 135. The vehicle to be loaded on the headramp is then driven, front-end or back-end-first, up the lowered rear ramps, onto the extended No. 2 position ramp and secured. Vincent Deposition at 29; Plaintiffs' Exhibits A–3—A–7. Additional vehicles can then be loaded using the same procedure in the open remaining positions on the upper and lower ramps of the trailer unit. Plaintiffs' Exhibits A–1, A–2. The Model 3200 is not equipped with an "after the market" "cat walk," or walking surface, covering the entire length of the hydraulic cylinder and the extended piston. Vincent Deposition at 30–31. Vehicles loaded by backing them into the No. 2 position can also be accessed through their driver's side doors by climbing steps located on the right side of the autohauler cab. Proctor Report at 13, ¶ 11; Plaintiffs' Exhibit S.

In this case, Dreyer, 6′ 5″ tall and weighing over 300 pounds, attempted to unload the No. 2 position Astro minivan, which Dreyer had loaded onto the autohauler front-end-first, by walking up the ramps from the rear of the autohauler intending to enter the minivan through its driver's side door.[7] Dreyer Deposition at 76; Proctor Report at 12, ¶ 1; Plaintiffs' Exhibit A–4. As the Astro minivan involved in the accident had a factory-installed "cage" for commercial use inside the rear area of the minivan, access to its passenger compartment could not be

---

**6.** The record does not conclusively indicate whether the piston rod on which Dreyer stepped at the time of the accident was in fact oily. However, Plaintiffs' expert, Ms. Weseman, based on Terzian's testimony, agreed the piston was probably oily at the time of the accident. Weseman Report at 24.

**7.** Dreyer had been hired in 1988 and received one week of safety training prior to commencing work. Proctor Report at 11, ¶ 11.

gained through the minivan's rear doors. Dreyer Deposition at 76, 78. Intending to enter the minivan through the driver's side door, Dreyer, while moving along the side of the minivan toward the driver's side door and attempting to support himself by gripping the minivan's roof with his hands, stepped on the exposed portion of the fully extended hydraulic piston rod.[8] Proctor Report at 12, ¶ 1; Dreyer Deposition at 76–78; Vincent Deposition at 30; Ferguson Deposition at 19. However, Dreyer lost his balance in a high wind gust and slipped, falling eight feet to the ground. *Id.* As a result of the fall, Dreyer suffered a broken right ankle, a fractured right elbow, and an injury to his right wrist requiring five surgeries as of March 15, 1999 when Dreyer was deposed. Proctor Report at 12, ¶ 2.

Vincent testified that in order to obtain access to the driver side door of a minivan loaded, as in this case, front-end-first in the Model 3200's No. 2 position, a driver must "lean[ ] in towards [the minivan] trying to keep your balance as best you could." [*sic*] Vincent Deposition at 30. Because of a slight bulge in the shape of the minivan, Vincent estimated a driver has about five inches of footing on the ramp surface on each side of the loaded minivan. *Id.* at 43. Additionally, because of the limited width of the ramps, the wider shape of an Astro minivan, compared to other models, and the absence of baggage rails along the length of its roof which drivers could grip to help secure themselves, Harold Banks, another experienced Model 3200 driver, testified that in order to unload an Astro minivan from the No. 2 position, it is necessary for the driver to step on the exposed piston of the hydraulic cylinder as "it's the only way you can get across [the cylinder] to get into that van." Plaintiffs' Exhibit M (Deposition of Harold Banks, September 29, 2000) ("Banks Deposition") at 19 (bracketed material added).

Alexander L. Faler, a driver trainer for Model 3200 drivers, employed by Allied Holdings, Inc., successor to CCI, testified that he had observed drivers approaching loaded vehicles by walking up the ramps from the rear of the autohauler and stepping on the exposed piston in order to gain access to the driver's side door of the vehicles, and that such mode of access was "common practice" by drivers despite verbal warnings that it was unsafe to do so. (Deposition of Alexander L. Faler, Sept. 28, 2000) ("Faler Deposition").[9] Faler also testified he was aware of other drivers falling from the head ramp area of the Model 3200, similar to Dreyer's accident. *Id.* at 16.

In preparing his report, Proctor inspected the autohauler and observed an experienced driver, Faler, load and unload a minivan from the No. 2 position as a basis for Proctor's opinion that the Model 3200 autohauler was not defectively designed because the accident resulted from Dreyer's own negligence in improperly loading the minivan front-end-first, instead of backing the vehicle into the No. 2 position, and in Dreyer's attempt to unload it during high winds, without maintaining a three-point stance, and while under the possible influence of prescription medications. Proctor Report at 13, ¶ 11. Autohauler drivers, including Dreyer, are

---

**8.** The record is unclear whether at that point both of Dreyer's feet were on the piston rod.

**9.** Proctor acknowledged that Dreyer's method of unloading the minivan by walking up the ramp and approaching the minivan from the rear to unload it, thus inviting use of the piston as a foot support, "is not the preferred method of ingress, *but it is accepted,*" and that in employing this method of unloading the driver "would not have a three-point stance." Proctor Deposition at 95 (underlining added).

trained to maintain a three-point stance, *i.e.,* three limbs in contact with the auto-hauler and load at all times while loading or unloading. Proctor Report at 11, ¶¶ 2–3.

According to Proctor, Dreyer's decision to load the Astro minivan front-end-first on the Model 3200's No. 2 position prevented Dreyer from being able to maintain a stable three-point stance while unloading the minivan from the No. 2 position. Proctor Deposition at 182, 198–97; Defendants' Memorandum at 8–9. Dreyer's failure to load and unload the minivan so as to assure maintaining the three-point stance, as Dreyer's training dictated, was, according to Proctor, the primary cause of the accident. Proctor Deposition at 94, 165, 178, 182–84; Defendants' Memorandum at 4, 8–9.[10] In preparation for his report, Proctor did not attempt to reconstruct the accident as he deemed it too dangerous to do so. Proctor Deposition at 74, 177. Nor did Proctor take any measurements, perform any tests, review the Model 3200's blueprints, or refer to the experience of Model 3200 drivers, like Banks, Ferguson and, Vincent, regarding safety issues in loading and unloading the Model 3200, review a videotape of Plaintiffs' demonstration of loading and accessing to the headramp area, replicating Dreyer's actions prior to the accident, consider Dreyer's training experience, or prior safety studies of the Model 3200 regarding driver falls from the headramp conducted by academic researchers. Proctor Deposition at 44, 50–51, 73–74, 103–04; Plaintiffs' Memorandum at 9.

## DISCUSSION

Plaintiffs contend that Proctor is not qualified to give expert testimony pursuant to Fed.R.Evid. 702 ("Rule 702") on the issues presented for determination of the jury in this case.[11] Plaintiffs' Memorandum at 1–2. Specifically, Plaintiffs argue that although Proctor is a trained mechanical engineer and a licensed professional engineer, he lacks sufficient experience in, or special knowledge of, the design and operation of autohaulers particularly in regard to the risk of driver falls like the one at issue in this case. *Id.* at 9.[12] Plaintiffs therefore maintain that Proctor's conclusions and opinions are outside his "field of expertise." *Id.* at 2.

Plaintiffs further submit that, even if Proctor is qualified as an expert, because Proctor's opinions lack a reliable scientific or other technical basis, they must be excluded under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("*Daubert*"). Plaintiffs' Memorandum at 2. In particular, Plaintiffs point to the fact that Proctor did not attempt to reconstruct the accident, conduct tests, take measurements, or review designs of the Model 3200. Plaintiffs' Memorandum at 1. Nor, Plaintiffs argue, did Proctor consider driver experience in loading and unloading autohaulers, the feasibility of additional safety features for the Model 3200 or the findings and recommendations of outside safety studies concerning the risk of driver falls from autohaulers like the Model 3200. *Id.* at 2, 13. Further, Plain-

---

**10.** The three-point stance requirement is also promulgated by the Occupational Safety and Health Administration ("OSHA") as an industrial safety standard by 49 C.F.R. § 399.207(a) (" § 399.207(a)"). As relevant, § 399.207(a) requires that any person entering or exiting a "truck or truck-tractor" must be able, using "sufficient steps and hand-holds, and/or deck plates" to maintain "at least three limbs in contact with the truck or truck-tractor at any time."

**11.** Plaintiffs have demanded a jury trial.

**12.** Although not directly stated by Plaintiffs as a ground for disqualification, according to the record, Proctor also is not qualified as an accident reconstruction expert.

tiffs assert Proctor did not purport to base his findings upon any scientific or engineering methodology, or provide any technical explanation for his conclusions. Plaintiffs' Memorandum at 15. Finally, Plaintiffs contend Proctor's conclusions that statistical evidence supports finding the Model 3200 was properly designed was based on unverified data, and that Proctor's opinion that Dreyer was adversely affected at the time of the accident by prescription medications is lacking in any expert knowledge. Plaintiffs' Memorandum at 22–25, 28.[13]

Defendants contend that Plaintiffs have not persuasively shown Proctor's qualifications are insufficient. Defendants' Memorandum at 5. Defendants assert Proctor's academic training and doctorate in mechanical engineering, his status as licensed professional engineer, his research, teaching, and consulting experiences with the autohauler industry, and as an expert witness in other litigation, support a finding of expert qualification for Proctor in this case under Rule 702. Id. at 5–6. Proctor also stated he has expertise in the field of human-machine interface problems based on post-doctoral studies of leading treatises in this subject area. Proctor Deposition at 17–18. Particularly, Defendants contend Proctor's rejection of Plaintiffs' claims of an asserted design defect in the Model 3200 is supported by Proctor's calculation of a low "injury per exposure rate" based on Defendants' accident data pertaining to driver falls from the Model

3200. Id. at 6. Defendants also argue that Plaintiffs' opposition to Proctor's conclusions regarding the potential and adverse effects of Dreyer's medications are not "plausible." Defendants' Memorandum at 9.

In this case, Proctor's Report and testimony should be excluded because Defendants have failed to meet their burden to show that (1) Proctor qualifies under Rule 702 to give expert testimony on whether the Model 3200 was negligently designed and whether Dreyer's negligence caused his injuries; (2) Proctor's findings and opinions are relevant to the issues likely to be presented to the jury; and (3) even assuming their relevance, there is a reliable scientific or technical basis for Proctor's opinions, and that they are grounded upon sufficient facts or data as required by Rule 702 and *Daubert.*

### 1. *Proctor's Qualifications*

In federal court, persons qualified as experts in the relevant subject may offer opinion testimony involving "scientific, technical or other specialized knowledge" if such testimony "will assist the fact trier"[14] in understanding the evidence or determining an issue of fact provided "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Civ. 702. Pursuant to Fed.R.Evid. 104(a) ("Rule 104(a)"), the proponent of the

---

**13.** Plaintiffs also complain that Defendants failed to provide, pursuant to Plaintiffs' deposition subpoena, drafts of Proctor's report and communications between Proctor and Defendants' counsel relating to any editing of such drafts made by counsel or Proctor based on such communications. Plaintiffs' Memorandum at 10. However, in the absence of a motion to compel, the court will not address this issue. See W.R.Grace & Co.-Conn. v. Zotos Int'l, Inc., 2000 WL 1843258 (W.D.N.Y.

2000) (finding testifying expert's report draft and related communications with counsel outside the attorney-work product doctrine and defendant's failure to preserve documents as subject to sanctions based on spoilation of evidence), aff'd, Slip Op. 98–CV–838S(F), August 27, 2002, (Doc. No. 62) (WMS).

**14.** As Plaintiffs have demanded a jury trial, further references to the "trier of fact" will be to "the jury."

expert testimony carries the burden to establish that the proffered testimony satisfies the requirements for admissibility under Rule 702. *Plourde v. Gladstone,* 190 F.Supp.2d 708, 718–19 (D.Vt.2002) (citing cases), *aff'd,* 69 Fed.Appx. 485 (2d Cir.2003) (table); *Freeport–McMoran Resource Partners Ltd. Partnership v. B–B Paint Corp.,* 56 F.Supp.2d 823, 832 (E.D.Mich.1999); Advisory Committee Notes 2000 Amendments to Rule 702 ("Under [Fed.R.Evid. 104(a)] the proponent [of the expert testimony] has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.") (citing *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). Thus, Defendants carry the burden to establish Proctor is qualified to testify as an expert witness in this case and that his opinions meet Rule 702 and *Daubert* requirements.

Pursuant to Rule 104(a), the party seeking to qualify a witness as an expert must establish that the witness possesses "scientific, technical or other specialized knowledge," relevant to issues in the case, as required by Rule 702, based on the witness's "knowledge, skill, experience, training or education." Rule 702. Whether a witness possesses these attributes sufficient to qualify as an expert witness in the particular case "is within the broad discretion" of the court. *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 81 (2d Cir.1997) (citing *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) (per curium)). While the court approaches the question of expert qualification with "liberality and feasibility" and avoids subjecting the witness to "an overly narrow test of his qualifications," nevertheless, the expert must "stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field

or discipline." *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227–28 (N.D.N.Y.1994) (citing cases), *aff'd,* 101 F.3d 682 (2d Cir.1996) (table). Further, in assessing qualifications, the court should take care not to preclude an expert for lack of specific experience in the area of product design at issue so as to limit the source of qualified experts for the plaintiff to persons with direct experience in the industry of which the defendant is a member. *Stagl, supra,* at 81.

However, a witness who otherwise may possess sufficient professional credentials to qualify as an expert in the particular case yet fails to employ investigative techniques sufficient to give a reliable opinion or is unable to explain the technical basis for his opinion, may be disqualified. *See Mannix v. Chrysler Corp.,* 2001 WL 477291 (E.D.N.Y. March 4, 2001) (mechanical and professional engineer who could not explain with sufficient technical support the reasons for his opinion, *i.e.,* that an airbag suspected of starting fire causing plaintiff's injuries was defectively designed, lacked qualifications as an expert on issue of defective design of airbag in product liability case). *Compare Stagl, supra* (reversing district court's exclusion of expert witness for lack of direct experience in the design of airport baggage retrieval system as unreasonably narrowing the pool of available experts for plaintiff). Thus, as the court finds in this case, a witness objectively competent to testify as an expert may, by his failure to apply such apparent expertise to the issues upon which expert testimony could assist the jury, render himself disqualified as an expert. *See Mannix, supra.*[15] Further, where an expert's opinion exceeds the scope of his qualifications, the witness's opinions are subject to exclusion. *See Stagl,* 117 F.3d at 81 ("courts may proper-

**15.** Both *Mannix* and *Stagl* involved the same expert.

ly conclude that witnesses are insufficiently qualified despite the relevance of their testimony because their expertise is too general or too deficient"). Unlike the courts in *Lappe* and *Stagl*, here the court has the benefit of an extensive deposition (435 pages over two days) of Proctor with which to evaluate whether Proctor, notwithstanding numerous credentials, is competent to serve as an expert with regard to the particular issues in this case.

As to Proctor's qualifications, there are several undisputed facts demonstrating Proctor lacks sufficient competency, under Rule 702's criteria, to give expert testimony in this case. First, Rule 702 expressly requires that to testify as an expert, the witness must be shown to qualify as an expert by virtue of "knowledge, skill, experience, training, or education that will assist the jury in understanding evidence or determining a fact in issue." Fed.R.Evid. 702. Here, as noted, the primary issues for the jury will be whether the Model 3200 suffered from a design defect that contributed to Dreyer's fall, the risk of which should have been reasonably foreseen requiring additional safety features to prevent such a fall, and whether Dreyer's loading and unloading of the Astro minivan under the circumstances confronting Dreyer were negligent causes contributing to the accident. While Defendants contend Proctor has "specific expertise in car hauling trailers and securement systems," Defendants' Memorandum at 6, Defendants fail to point to any facts sufficient to support this assertion, as is their burden, and a close reading of the record indicates otherwise.

Specifically, although Proctor holds a doctorate in mechanical engineering, Proctor Report at 1; Proctor Deposition at 12–13, is a licensed professional engineer, and has pursued independent study in the subject of biomechanics,[16] particularly "rachet securement systems used in the autohauler industry," Proctor Report at 2; Proctor Deposition at 13–14, Proctor has no direct experience in the design of an autohauler, Proctor Deposition at 10, nor do any of his numerous publications or teaching assignments deal, directly or indirectly, with the design of any similar devices or machines. *See* Proctor Report Appendix 1, 2 (*passim*). While Proctor has taught courses on the subject of mechanical engineering design, nothing in the record suggests how these courses might relate to the design of a major industrial product like an autohauler. Significantly, when asked to explain how a designer would go about assessing the foreseeability of user risk in connection with a product, Proctor was unable to give a direct answer stating the answer would be in "different books" and his class "notes." Proctor Deposition at 25–26. Asked how he would advise students to learn about worker fall suppression design problems, Proctor responded that he would refer them to unspecific OSHA regulations. Proctor Deposition at 37–38. Awareness that OSHA regulations should be consulted in designing products for the workplace does not require special technical skill, education, knowledge, experience or training of an engineering nature, and, Proctor made no attempt to explain how such regulations would be of assistance in the safe design of a complex mechanical product like an autohauler.

Further, none of Proctor's consulting engagements have involved autohauler fall protection systems. Proctor Deposition at 9. For instance, a careful review of Proctor's publication list, Proctor Report Appendix 1, reveals nearly all of Proctor's

---

**16.** Biomechanics is the study of the interface between humans and machines and includes ergonomics. Proctor Deposition at 17.

publications involve issues relating to problems of industrial pollution; none are directed to the proper design and safe operation of industrial or commercial products, particularly, as relevant to this case, autohaulers like Defendants' Model 3200. Additionally, while Proctor has participated in the design of "a couple" of consumer and industrial products, Proctor Deposition at 10, none of his design experiences relate to the "autohauler industry." *Id.* Except for unspecified consulting work for the autohauler industry other than issues pertaining to the autohaulers' rachet tie-down systems, Proctor has had no special education, professional experience or training regarding the autohauler industry. *Id.* at 11–12. Further, as noted, although Defendants assert Proctor has "specific expertise in car hauling trailers," Defendants Memorandum at 6, Defendants do not claim Proctor's "expertise" includes the design of autohaulers, the primary issue in this case. Here, it is evident that Proctor's expertise as it relates to autohaulers is directed to safety issues regarding failure of the tie-down rachet system used to secure vehicles on an autohauler. Finally, Proctor does not explain how his education, training and experience relates to the primary issues in this case, nor is such relevance otherwise provided in the record. The court therefore finds that expertise regarding whether an autohauler's tie down system was properly designed does not extend to questions of fall prevention design issues, and driver negligence during loading and unloading. Accordingly, Proctor's findings and opinions in this case are "outside the reasonable confines of his qualifications." *Lappe, supra.*

Any suggestion that Proctor, as a mechanical engineer and licensed professional engineer, possesses such "expertise" in the design of an autohauler is further negated by the deposition testimony of Earl Lempke, the head of Defendant Delavan's engineering department and Peter J. Terzian,

Delavan's plant manager, who were directly involved in the design of the Model 3200. Lempke Deposition at 21; Terzian Deposition at 23. Lempke testified that, prior to being employed by Delavan, he had studied engineering for two years at a local university, forty years prior to the time the Model 3200 was designed, without achieving a degree. *Id.* at 4. Terzian, who holds a GED diploma, has no engineering training or background. Terzian Deposition at 38. Based on Lempke's and Terzian's testimonies, the ability to design an autohauler does not require special degree of formal engineering education, as such capacity is primarily based on experience in the actual design of autohaulers. That Proctor has no experience in the design of an autohauler is further demonstrated by his testimony that he agreed that if Earl Lempke, a non-engineer, vice president of engineering for Defendant Delavan, believed additional safety features, as Plaintiffs contend should have been incorporated in the Model 3200 from which Dreyer fell, could be feasibly added to the Model 3200, an issue that reasonably calls for some technical knowledge, Proctor would agree with Lempke's assessment. Proctor Deposition at 388. Lempke did so testify. Lempke Deposition at 77. Proctor's lack of experience or training in autohauler design therefore disqualifies him from opining as to the safe design of the Model 3200.

Additionally, Proctor's qualifications as an expert on issues of autohauler design are not established by Proctor's reliance on engineering treatises. For example, in support of his conclusion that the Model 3200 was properly designed, Proctor Report at 12–13, Proctor testified that good engineering design practice required that the designer consider the purposes and users of the product together as well as the potential for its misuse by a likely user. Proctor Deposition at 24–25. In

support of this principle, Proctor cited to several engineering texts, *i.e.,* Konz, WORK DESIGN AND INDUSTRIAL ERGONOMICS; Woodson, HUMAN FACTORS DESIGN HANDBOOK, Proctor Deposition at 52, and Earle, DESIGN HANDBOOK, *id.* at 117. However, other than reiterating the generalized references to good engineering design principles regarding the need to consider foreseeable uses, as discussed, according to Proctor, in these standard treatises, Proctor failed to make any attempt to apply such principles to the facts of the instant case in either his Report or deposition testimony. Specifically, Proctor testified that because the design of the Model 3200 was in his opinion "appropriate," Proctor Deposition at 32, it was not necessary that he consider whether Dreyer's negligent use of the Model 3200, as determined by Proctor, Proctor Report at 13; Proctor Deposition at 79–80, should reasonably have been foreseen by the designers of the Model 3200. No explanation is given by Proctor of how the general good engineering principles expounded by Proctor based on the cited treatises, and as applied to the facts of the case, support his conclusion that the Model 3200's design was "appropriate." Failure by a witness to determine whether, in applying the witness's expertise, a design defect exists in the accused product justifies disqualification despite the witness's apparent qualifications. *Mannix, supra,* at *1.

Specifically, when asked to explain how he would apply the general good engineering practice design principles, Proctor asserted were discussed in the textbooks he cited to an actual product design assignment, such as an autohauler, in regard to the potential for product abuse, Proctor responded that the answer was beyond the scope of the deposition. Proctor Deposition at 25–27. Proctor's inability to explain, within the relatively flexible confines of a pretrial deposition of a proposed expert witness, how the good engineering practices referred to by Proctor would be applied to minimize the risk of a possibly foreseeable product misuse, such as improper loading or unloading procedures by a driver of an autohauler like the Model 3200, demonstrates Proctor lacks competency to assist the jury in understanding the issues. *See Mannix, supra.* In this court's view, an expert who is incapable of explaining forthrightly basic concepts within his claimed area of expertise, as they apply to the issues in a case upon which his expertise is sought, at a deposition is not competent to offer testimony to the jury on such matters.

In fact, the generalized good engineering design standards articulated by Proctor, based on the cited treatises, that a designer of an industrial product consider the purposes of the product and its users as well as the possibility of misuse, do not appear significantly different from the general legal test for product liability. *See* Discussion, *infra,* at 434–36. As such, they fail to constitute information of a technical engineering nature sufficient to warrant giving expert testimony under Rule 702. Moreover, Proctor's inability to explain with any reasonable technical detail how the questions of proper design, anticipating how possible worker falls should be addressed by a product's design, is indicative of a fundamental unreliability under *Daubert's* requirements. *See Mannix, supra.* Such difficulties also point to the conclusion that Proctor is straying beyond the reasonable limits of his expertise in regard to autohauler design and manufacture. *See Stagl, supra* at 81; *Lappe, supra,* at 227.

While Proctor referenced, among his qualifications, several trials at which he was allowed to give expert testimony, none of them involved an issue of design defect based on a fall from an autohauler

or similar product. *See* Proctor Deposition at 56–70. In the one case mentioned by Proctor, involving a worker fall from a piece of industrial machinery, Proctor's opinion was that the accident was caused by a failure of a hydraulic fitting, and he could not recall giving any testimony regarding the need for a fall prevention system on the machine. *Id.* at 61. Significantly, Proctor agreed he has never testified as the cause of operator falls from industrial equipment. *Id.* at 60–61. Further, although Proctor stated he has acquired expertise in human-machine interface matters, such knowledge did not result, according to Proctor, from actual scientific or engineering studies but, rather, from his reading standard texts on the subject. Proctor Deposition at 17–18. Such "post-Doctoral study," as Proctor put it, *id.*, contrasts sharply with the "in depth" work in the field of the "interaction between people and machinery," found to be sufficient to qualify plaintiff's expert in *Stagl. Stagl*, 117 F.3d at 82. *See also McCullock v. H.B. Fuller Company*, 61 F.3d 1038, 1041–43 (2d Cir.1995) (consulting engineer with "extensive experience," including 15 years of research on subject of fumes or vapors in workplace qualified to testify on issue of effect of fumes on plaintiff despite lack of formal education on fume dispersion patterns or experience in interpreting air quality studies). Therefore, as Proctor lacks any special knowledge or experience in the design of autohaulers, particularly regarding driver fall prevention issues, or even other complex machinery requiring direct human involvement for their operation, is unable to explain the application of general engineering design principles to the issues in this case in a straight forward manner that could assist in the jury's understanding of the evidence in the case without direct reference to technical treatises or his class notes, and has insufficient expertise in human-machine interface issues, Proctor is not qualified to testify as to the adequacy of the Model 3200's design regarding the potential risk of driver falls.

Nor is Proctor qualified to testify on the issue of Dreyer's comparative negligence as a cause of the accident in support of Defendants' primary defense in this case. Proctor's opinions relating to this issue are based on his observation of an attempted recreation of the accident by an Allied employee, Proctor Report at 11, ¶ 1; Proctor Deposition at 73–75, the training Proctor received from Defendants on the proper loading and unloading methods for the Model 3200, Proctor Deposition at 85–87, and Proctor's opinion that Dreyer may have been impaired by potential side-effects of prescription medications Dreyer had taken at the time of the accident. Proctor Report at 14; Proctor Deposition at 424.[17] None of these factors, even taking into account Proctor's engineering and other credentials, support a finding that Proctor is qualified to provide expert testimony on these issues.

First, neither Proctor's Report nor his deposition testimony points to any body of scientific or generally accepted engineering principles that may be reliably applied in assessing whether a worker's use of an industrial product in general, or a driver's manner of loading or unloading an autohauler in particular, is negligent. Such deficiency includes Proctor's observed demonstration by Defendants of the loading and unloading of minivans on the Model 3200 as Proctor does not claim to be an accident reconstruction expert, and his

---

**17.** Proctor did not review Plaintiffs' photographs Exhibits A1–16 depicting loading and unloading from the Model 3200's headramp, or a video of Plaintiffs' inspection of the Model 3200. Proctor Deposition at 46–47.

failure to reconstruct Dreyer's accident because, as Proctor asserted, such reconstruction would be too dangerous. Proctor Deposition at 74, 177. *Compare Lappe, supra,* at 227 (expert witness with Ph.D in biomedical engineering without direct experience in auto design qualified as an expert in defective design case based on extensive experience in accident reconstruction and analysis of vehicular accidents).

Second, Proctor's conclusion that Dreyer failed to properly load and unload the Astro minivan while maintaining the "three-point stance" is based, not on any principles of mechanical or biomechanical engineering, but on both the training Proctor received from Defendants in the operation of the Model 3200, Proctor Deposition at 85–87, and Proctor's opinion that unloading the Astro minivan under the conditions presented constituted a lack of common sense and good judgment on Dreyer's part. Proctor Report at 13; Proctor Deposition at 409–10. However, Proctor's only actual hands-on training as relevant to this case was limited to the loading of a Model 3200, not its unloading, and Proctor has no experience in operating a fully loaded autohauler under normal commercial delivery conditions. Proctor Deposition at 85, 87, 114. Indeed, much of Proctor's training on the proper operation of a Model 3200 was gleaned from reading manuals and watching videotapes supplied by Defendants. *Id.* at 102–03. Moreover, Proctor's hands-on training in loading vehicles on the autohaulers was with Defendants' Model 2827, not the 3200.[18] *Id.* at 429–31. As, based on the training received from Defendants, Proctor lacks any significant experience in the proper operation of a Model 3200, particularly the unloading of vehicles from its headramp, the court finds he does not qualify to give expert testimony as to Dreyer's negligence on this

ground. *See Byrne v. Liquid Asphalt Systems, Inc.,* 238 F.Supp.2d 491–95 (E.D.N.Y.2002) (excluding witness who would testify as to "more practical" design for an "asphalt kettle" as witness had neither built nor worked on any asphalt kettle but had only observed an asphalt kettle in operation four or five times over a 50 year period).

Third, while experience can provide the basis to qualify a witness as an expert, the experience must be demonstrated and have direct relevance to the issues in the case. *Wilson v. Woods,* 163 F.3d 935, 938 (5th Cir.1999) (proposed accident reconstruction expert who had not taught accident reconstruction courses, never experimented, conducted field studies, or published on the subject, not qualified as expert witness); *Eagleston v. Guido,* 41 F.3d 865, 874 (2d Cir.1994), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995) (proposed expert who lacked familiarity with arrest procedures at issue not qualified); *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 436 (W.D.N.Y. 2001) (board certified neurosurgeon who lacked experience in performing specific type of implant surgery at issue not qualified as an expert on the issue of product liability as a matter of skill, experience or training); *Mancuso v. Consolidated Edison Co. of New York, Inc.,* 967 F.Supp. 1437, 1443–44 (S.D.N.Y.1997) (internist with limited experience in diagnosing PCB related illness not qualified to testify that plaintiff's injuries were caused by exposure to PCB's from defendant's electrical transformers). *Compare Kelsay v. Consolidated Rail Corporation,* 749 F.2d 437, 448 (7th Cir.1984) (police officer with experience in investigating 20 prior railroad crossing accidents qualified as expert to testify that cause of accident was driver inattention).

---

18. Defendants make no showing that the two models are of similar design.

Here, Proctor has not demonstrated experience in the field of accident reconstruction and in evaluating driver negligence as a defense to claims based on Defendants Model 3200 alleged defect or other autohaulers by investigating prior accidents involving falls from autohaulers similar to Dreyer's, nor has Proctor conducted any research, accident reconstruction, field tests or experiments, or published articles on the subject of driver misuse or negligent operation of autohaulers or other types of trucks or autos, in particular, or on the issue of industrial product misuse and operator workplace negligence in general. *Compare DiMeo v. Minster Machine Co.* 388 F.2d 18, 20 (2d Cir.1968) (where the challenged expert's opinion permitted by the court was that a design defect, which allowed a power press to recycle while the operator's hand was inside the press, was the cause of plaintiff's injury). Here, as discussed, Discussion, *infra,* at 438–42, no similar technical explanation is required to explain the cause of Dreyer's injury as determined by Proctor.

Fourth, Proctor opined that Dreyer's accident may have been caused by Dreyer's prescription medications, Depakote and Ritalin, and that such usage, in conjunction with the adverse conditions existing at the time of the accident, also constituted negligent conduct by Dreyer. Proctor Report at 14; Proctor Deposition at 424.[19] However, Proctor admitted he was untrained in pharmacology, Proctor Deposition at 420–21, and had no special knowledge or expertise concerning the potential side effects upon a worker like Dreyer from the medications. *Id.* at 420. Rather, Proctor's knowledge of such potential side effects was based on reading publically available information he obtained from the Internet. As such, Proctor's knowledge on this particular subject is no better than that of any layman with access to these sources. *See Stagl, supra,* at 82 (expert knowledge needed to qualify under Rule 702 should be information "most likely beyond the knowledge of an average juror.") While Proctor asserted that his mechanical engineering and biomechanics background enabled him to opine that Dreyer may have been adversely affected by the medications, *id.* at 423, neither Proctor nor Defendants attempt to explain how such engineering and biomechanical knowledge extends to questions regarding the side effects from prescription medications on the risk of worker on-the-job injuries sufficient to qualify Proctor as an expert on this subject. *Prohaska, supra,* at 436–37 (witness who lacks specific knowledge, skill, experience or training in subject matter at issue disqualified as an expert); *Mancuso, supra,* at 1442–44 (lack of extensive experience and absence of formal training requires disqualification); *Lappe, supra,* at 227–28 (expert not permitted to opine on subject beyond field of expertise). *Compare McCullock, supra,* at 1041–43 ("extensive experience" in working with particular subject matter at issue in case sufficient to qualify witness as an expert despite lack of formal education). As discussed, it is Defendants' burden to satisfy the court as to Proctor's claimed expertise on this and other subjects in this case. Rule 103(a). Defendants have notably failed to do so.

Proctor appears to be, as Defendants contend, Defendants' Memorandum at 5–6, a well-credentialed mechanical engineer;

---

19. Proctor also alludes to the fact that Dreyer's commercial driver's license was suspended in November 1998, nearly two years after the accident, because Dreyer had been prescribed Clozapine, a psychotropic drug used to treat schizophrenia. Proctor Report at 11, ¶ 4. However, nothing in the record indicates that Dreyer had been prescribed this drug prior to the accident.

however, *Daubert* requires federal courts evaluate all proffered expert testimony, when challenged under Rule 702, on a case-by-case basis, and directs district courts not to merely 'rubber-stamp' such evidence based solely upon the expert's resumé, including any testimonial history. In this case, Proctor's report runs 36 pages and includes a biography, teaching assignments, a listing of consultant engagements, professional publications, past trial testimony, professional membership and related activities, and descriptions of Ritalin, Depakote, and Clozapine obtained from an Internet source. Significantly, the portion of the report devoted to Dreyer's accident and Proctor's opinions regarding its cause and the safe design of the Model 3200 accounts for just over three pages. Further, a careful review of Proctor's publication list, Proctor Report Appendix 1, reveals nearly all Proctor's publications involve issues relating to problems of industrial pollution; none are directed at issues of safety considerations related to the design or manufacture of large-scale and complex industrial or commercial products, particularly autohaulers like Defendants' Model 3200.

Further, while according to Appendix 3 of his Report, Proctor has testified in at least 22 trials, only two relate to accidents involving an autohauler, and one of these specifically relates to product liability arising from the plaintiff's use of a tie-down ratchet mechanism, Proctor's Report at 28, an issue not involved in Dreyer's case. The other case, *Street v. Ryder, id.* at 27, also involves an autohauler, but the description provided fails to state whether the case involved alleged design defect issues similar to those in the instant case. As noted, Defendants represent that Proctor was recently allowed to testify in the Eastern District of Missouri against GACS, and in a product liability case involving an autohauler in the Southern District of Illinois, Defendants' Memorandum at 6, but Defendants fail to explain whether the plaintiffs' liability theories in those cases are similar to those in this case, and whether Proctor's testimony was challenged under Rule 702. More specifically, at his deposition in May 2001, Proctor agreed with Plaintiffs that he has never, prior to the instant action, been requested to provide expert testimony in a case involving a driver's fall from an autohauler. Proctor Deposition at 55–56. Presumably, if Proctor's recent testimony involved an issue even similar to the instant case, Defendants could be expected to have so represented. Notwithstanding Proctor's credentials and prior experience as a testifying expert, in this case Proctor's Report and expected testimony fail to meet Rule 702's and *Daubert's* requirements.

Thus, because Proctor lacks any relevant or sufficient experience, training, skill or specialized technical knowledge regarding such issue and has not put forth any reliable scientific or technical principles that could assist the jury in evaluating the evidence on this issue, Proctor is not qualified to testify as an expert concerning Dreyer's negligence as the primary cause of the accident. *See Blanchard,* 207 F.Supp.2d at 317 (psychiatrist who was not an expert in pharmacology, epidemiology, or toxicology not qualified to testify on causal relation between decedent's fatal assaults and suicide). *Compare Kelsay, supra* (based on lengthy accident investigative experience, expert permitted to testify that railroad crossing accident was caused by driver inattention).

2. *Relevance and Reliability.*

Presented with a challenge to the admissibility of expert testimony, a court determines whether the testimony meets Rule 702's standard of "evidentiary reliability." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. Courts are to particularly as-

sess whether the reasoning or methodology underlying the proposed testimony is scientifically valid "and whether such reasoning or methodology applies to the facts of the case." *Id.* at 592–93, 113 S.Ct. 2786. Additionally, the court must take care to admit only scientifically valid expert testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert, supra,* at 591, 113 S.Ct. 2786 (quoting Rule 702). The court's inquiry must be directed to whether the testimony at issue has been "subjected to the scientific method; it must rule out subjective belief or unsupported speculation." *Cummins v. Lyle Industries,* 93 F.3d 362, 368 (7th Cir.1996) (citing and quoting cases). As the Supreme Court in *Daubert* stated, "[p]roposed [expert] testimony must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known." *Daubert, supra,* at 590, 113 S.Ct. 2786 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1251 (1986)) (bracketed material added). Thus, federal judges are required to exercise "more control over experts than over lay witnesses." Additionally, the testimony must be calculated to be of assistance to the jury in determinating an issue or evidence in the case. "This condition goes primarily to relevance." *Daubert, supra,* at 591, 113 S.Ct. 2786. In deciding whether the proffered testimony is relevant to the issues before the jury the court must, as Rule 702 requires, also satisfy itself that the testimony is "sufficiently tied to the facts of the case." *Daubert, supra,* at 591, 113 S.Ct. 2786 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985)). This "consideration has been aptly ... described ... as one of 'fit.'" *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 (quoting *Downing, supra*).. "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other unrelated purposes." *Id.*

Even if found relevant under Rule 702, proffered expert testimony should also be excluded pursuant to Fed.R.Evid. 403 ("Rule 403"), where the testimony's probative value is outweighed by the risk of "undue prejudice, confusion of the issues, or misleading the jury," potential problems especially present when expert testimony is involved. *Daubert, supra,* at 595, 113 S.Ct. 2786. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* (quoting Weinstein, J., *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)). While not directly asserted by Plaintiffs as a ground for exclusion, in performing its "gatekeeping function" with respect to the admissibility of expert testimony under Rule 702, a court also must determine whether, as part of such "gatekeeping obligation," *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the expert testimony fully satisfies Rule 403 as well as Rule 702. *See United States v. Dukagjini,* 326 F.3d 45, 54 (2d Cir.2003). As the court in *Dukagjini* stated, "[e]ven if the testimony is admissible under Rule 702, it still must pass muster under Rule 403: Its probative value must not be substantially outweighed by unfair prejudice." *Id.* Moreover, where the expert strays from his "scope of expertise," such intrusion into subjects beyond proffered findings based on reliable science or technology, may produce an equally undue degree of juror confusion violative of Rule 403. *Id.*

The thresholds for admissibility established in *Daubert* also apply to technical and engineering opinions. *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases." *Id.* at 150, 119

S.Ct. 1167. Although *Daubert* sets forth several factors as guidance to a court in assessing the reliability of expert testimony, *Kumho,* 526 U.S. at 141, 119 S.Ct. 1167, *i.e.,* whether the methodology underlying the objective basis for the opinion has been subjected to peer review, can be or has been tested, is subject to controlled error rates, or enjoys general acceptance within a relevant scientific community, *id.* at 149–50, 119 S.Ct. 1167, other factors may be applied based on the circumstances of a particular case. *Kumho,. supra,* at 150, 119 S.Ct. 1167.[20] The reliability of the expert's methodology in reaching his conclusions must therefore be · evaluated against the specific facts at issue, not generalized theories. *Id.* at 154, 119 S.Ct. 1167 (noting that the expert's asserted technique for establishing a manufacturing defect must be measured as to the particular issue of product liability in the case, *e.g.,* the reasons for the tire failure in *Kumho* ).

As with the question of a witness's qualifications to provide expert testimony, the court has broad discretion in exercising this important "gatekeeping" ·function. *Kumho, supra,* at 153, 119 S.Ct. 1167 (court has "broad latitude to determine" *Daubert* issues). Thus, if Proctor's conclusions or opinions are neither relevant to an issue of fact pertinent to the case, nor based on specialized or engineering knowledge using adequate data or reliable scientific principles and methods reliably applied to the facts of the case that will assist the jury in understanding evidence and deciding fact questions germane to this case, Fed.R.Evid. 702, they should be excluded. Accordingly, for purposes of satisfying Rule 702, the relevancy of the challenged testimony turns on the circumstances of the specific case, the factual issues presented, and the legal standards to be applied by the jury in their resolution. *Kumho, supra,* at 150, 119 S.Ct. 1167.

Here, Plaintiffs allege the Model 3200 was negligently designed and manufactured by Defendant Delavan in failing to include sufficient safety features, warnings, and instructions to prevent driver falls like the one suffered by Dreyer. Complaint ¶¶ 10, 14. Plaintiffs also allege breach of the implied warranty that the Model 3200 was reasonably safe for intended and foreseeable purposes, and seek punitive damages based on Defendants' reckless disregard of foreseeable harm arising from driver use of the Model 3200. Complaint ¶ 18.[21] Defendants asserted several defenses including that Dreyer's injuries were caused by his own negligence and misuse of the Model 3200.[22] Amended Answer ¶¶ 9–10, 12.

Preliminarily, the court notes that under the laws of both New York, the place of the Model 3200's manufacture, and

---

**20.** . Examples of such factors include (1) whether the testimony derives from independent research, (2) whether the expert accounted for obvious alternative explanations, (3) whether the expert has employed the same intellectual rigor in the courtroom as in the relevant field of expertise, (4) whether the expert's field itself lacks scientific reliability, (5) the non-judicial uses to which the offered method has been put, (6) the comprehensiveness of the information upon which the opinion is based, (7) disclosure of the theoretical basis for the opinion, and (8) the quantity and similarity of non-scientific opinions. *Blanch-*

*ard v. Eli Lilly & Company,* 207 F.Supp.2d 308, 315–17 (D.Vt.2002) (citing cases and authorities).

**21.** The parties do not specifically address the excludability of Proctor's Report under Plaintiffs' breach of implied warranty clause; rather, Plaintiffs' motion is primarily directed to Plaintiffs' defective or negligent design theory.

**22.** Defendants' third affirmative defense of product misuse has been withdrawn. Stanton Affidavit, ¶ 4.

Indiana, Plaintiffs' domicile and where the accident occurred, the issue of whether a plaintiff was comparatively negligent is irrelevant to the question of a manufacturer's liability based on a design defect. However, unlike New York, Indiana law will bar a plaintiff from any recovery if the fact trier finds the plaintiff was more than fifty percent at fault.

In denying Defendants' recent motion *in limine* seeking to apply Indiana law to the issues in the case, Judge Arcara held that Defendants had waived the issue by failing to timely object to the application of New York law to Defendants' earlier motion for summary judgment and that Defendants had failed to point to any actual conflict between the laws of New York and Indiana. Decision and Order, filed October 25, 2004 (Doc. No. 143). The test for products liability based on defective design is similar in both states. *See Liriano v. Hobart Corp.*, 132 F.3d 124, 126 (2d Cir. 1998) (manufacturer has duty to use reasonable care in designing the product so that it will be safe when used in the "manner ... intended ... [and] unintended yet reasonably foreseeable use.") (quoting *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571, 577 (1976)); *Dow Chemical Co. v. Ebling*, 723 N.E.2d 881, 900 (Ind. Ct. of App.2000) (failure to use reasonable care in design of product resulting in product being "unreasonably dangerous to expected users when used in reasonably expectable ways ....") (citing Ind.Code § § 34-20-2-1; 34-20-4-1). Under New York's choice of law rule, as to the defense of comparative negligence, the law of the state where the plaintiff is domiciled and the accident occurred applies as a matter of post-accident loss allocation. *See Datskow v. Teledyne Continental Motors Aircraft Products*, 807 F.Supp. 941, 942 (W.D.N.Y.1992) ("If one of the parties is domiciled in the state where the accident happened, then that state provides the applicable law" as it is the state with the most significant interest in the effect of a limitation on the extent of a plaintiff's recovery based on the plaintiff's comparative negligence) (citing *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454, 458 (1972)) (Larimer, J.).

New York comparative negligence law makes the question of plaintiff's comparative negligence irrelevant to the issue of a defendant's product liability causing plaintiff's injuries as found by the jury. *See* N.Y. Civ. Prac. Law & R. § 1422 (McKinney 1997); *Dubecky v. S2 Yachts, Inc.*, 234 A.D.2d 501, 651 N.Y.S.2d 602, 603–04 (App. Div.2d Dep't 1996) (in design defect cases, plaintiff's comparative negligence does not relieve defendant of liability if "the design defect is found to be a proximate cause of the accident."). *See also Brodvin v. The Hertz Corporation*, 487 F.Supp. 1336, 1338 (S.D.N.Y.1980) (expert testimony as to plaintiff's failure to "exercise due care to avoid or mitigate injury by failing to use automotive seat belt cannot be considered in determining manufacturer's liability; it pertains only to the question of damages.") (citing *Spier v. Barker*, 35 N.Y.2d 444, 363 N.Y.S.2d 916, 323 N.E.2d 164, 167 (1974)). In contrast, under Indiana's Comparative Fault Act, if a plaintiff's "unreasonable failure to avoid an injury," is found by the jury to be more than fifty percent of all fault causing a plaintiff's injury, the plaintiff is barred from any recovery. Ind.Code § § 34-6-2-45; Sec. 45(a)(1); 34-51-2-6(a); *Heck v. Robey*, 659 N.E.2d 498, 504 (Ind.1995). Therefore, under applicable New York law, expert testimony is relevant to whether Defendants should reasonably have foreseen that Dreyer's method of loading and unloading the autohauler with a vehicle like the Astro minivan created unreasonable risks, and therefore should have provided additional safety features to prevent a driver's fall; but expert testimony that Dreyer was comparatively negligent in causing the fall is irrelevant to the issue of

whether the Model 3200 suffered from a negligent design defect.

Under Rule 702, a threshold condition of admissibility is that the proffered testimony be calculated to "assist the trier of fact to understand the evidence or to determine a fact in issue." As the Supreme Court in *Daubert* stated, "[t]his condition goes primarily to relevance." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting Weinstein and M. Berger, WEINSTEIN'S EVIDENCE, ¶ 702[02], p. 702–18 (internal quotation marks omitted)). *See also* Fed.R.Evid. 401 ("relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (internal quotation marks omitted).

The court thus turns to the question of whether, even if Proctor is qualified to give expert testimony upon the issues of the case, his testimony would be relevant to the two issues upon which Defendants seek to admit his testimony, *i.e.,* (1) the existence or absence of a design defect in the Model 3200, and (2) Dreyer's conduct as the primary or sole cause of the accident. Although Proctor acknowledged that the questions of a potential design defect in a product and a user's negligence in using the product are "independent," Proctor Deposition at 110, the record nevertheless makes it apparent that in Proctor's judgment, because Dreyer could have loaded and unloaded the Astro minivan safely with the Model 3200's existing design but failed to do so, the availability of the safer method of loading and unloading and Dreyer's unreasonable decision to disregard the safer method and to load and unload the minivan as he chose to under the adverse conditions presented at the time of the accident, demonstrated to Proctor that the Model 3200 was properly designed. Proctor Report at 13, ¶ 11; Proctor Deposition at 78–80. As Defendants posit, "if the vans were properly loaded [by Dryer], these issues [of defective design and Dreyer's negligence] would not exist." Defendants' Memorandum at 4.

Specifically, Proctor concluded that Dreyer was culpably negligent in attempting to unload the Astro minivan by stepping on the exposed, and presumably oily, piston rod during windy conditions. Proctor Report at 13, ¶ ¶ 8–9. As Proctor stated, "[i]t is known to any reasonable adult" that stepping on an exposed piston rod in windy conditions is "hazardous." *Id.* at 13, ¶ 8. Despite Proctor's view that the question of the autohauler's defective design and Dreyer's negligence were "independent" of each other, Proctor Deposition at 110, Proctor nevertheless found the Model 3200 was not defectively designed because Dreyer's negligence, not any safety deficiency in the design of the Model 3200, caused the accident. In fact, Proctor testified that it was not necessary for him to consider whether good engineering design principles required Defendants to have foreseen the possibility of the type of negligent use Proctor and Defendants attribute to Dreyer as "the design of the Delavan [Model 3200] is appropriate, so it's not necessary ... to do that." *Id.* at 32. Therefore, Proctor was unwilling or unable to explain why, based on his asserted competency as a mechanical engineer, the Model 3200's attributes, regarding potential driver negligence in loading and unloading the Model 3200, satisfied good engineering principles.

Proctor's conclusion that the Model 3200 was appropriately designed was based particularly on his finding, as noted, that Dreyer could have loaded the Astro minivan front-end-first in the No. 2 position

thereby availing him of the safe mode of egress and ingress to the minivan's driver's side door using steps located on the autohauler cab. Proctor Report at 11, ¶ 1; 13, ¶ ¶ 3, 11; Proctor Deposition at 78–79. Proctor also agreed that while the designer of the Model 3200 had the responsibility to include "appropriate [safety] measures," the driver was required "to use those features correctly ... [and] that [Dreyer] failed to do that." *Id.* at 79 (bracketed material added). As a result, Proctor did not find it necessary to consider whether alternative designs to improve driver safety as to the risk of falls should, or could, have been included in, or feasibly added to, the Model 3200, and he was not requested by Defendants to perform this analysis. *Id.* at 76–78.

However, because under applicable New York law a plaintiff's comparative negligence is irrelevant to the question of liability based on negligence design in a products liability case, Discussion, *supra*, at 435–36, Proctor's opinion that the Model 3200 is properly designed because Dreyer failed to properly load and unload the autohauler is irrelevant to the threshold question for the jury of whether the Model 3200 was defectively designed. *See Brodvin, supra*, at 1338. Rather, as under New York law, Dreyer's alleged negligence may, if and to the extent found by the jury to have caused the accident, significantly limit (or even eliminate) any damages that could be awarded, Proctor's opinion as to Dreyer's negligence as the cause of the accident could be relevant to this issue, if other conditions for its admissibility under Rule 702 and *Daubert* are satisfied. *See DiMeo*, 388 F.2d at 20 ("It is the function of the expert in a case such as this to give his 'educated guess' as to the cause of the accident.") (citing McCormack, EVIDENCE, at 29–38 (1954 ed.)).

Even if under applicable state substantive law, Proctor's opinion testimony were relevant to whether the Model 3200 suffered from a design defect in regard to driver falls from the headramp because of driver negligence, Proctor's findings and conclusions on this issue would nevertheless require exclusion for failure to meet Rule 702's requirement that expert testimony be based upon "scientific, technical or other specialized knowledge" of assistance to the jury in "understanding the evidence or to determine an issue of fact." Fed.R.Evid. 702.

First, Defendants fail to demonstrate that Proctor's opinion that the design of the Model 3200 was "appropriate," Proctor Deposition at 32, and thus free of defects because Dreyer could, by safely using the Model 3200, have avoided the accident, *id.*, at 78–79, is predicated on "scientific, technical, or other specialized knowledge." Proctor admitted he did not review the schematics of the Model 3200 for this case, Proctor Deposition at 73, did not take any measurements of the autohauler loaded with an Astro minivan in the No. 2 position, *id.* at 74, did not attempt to reconstruct the accident, *id.*, and did not review the particulars of the safety training Dreyer received in the operation of the Model 3200. *Id.* at 45. Instead, Proctor's opinions were based on Dreyer's explanation of how the accident occurred, a visual inspection of the Model 3200 loaded with an Astro minivan, and Faler's attempt to unload it from the No. 2 position. *Id.* at 42, 55.

While Proctor did state that "good engineering practice" requires a product's designer to consider foreseeable use, and even potential user misuse and abuse of the product, Proctor Deposition at 27, Proctor declined to explain the application of any relevant engineering principles or methods to the design of an autohauler including issues of driver safety based on falls from the headramp during loading or

unloading. *Id.* at 26. Proctor's unwillingness to provide such an explanation was based on the fact that because, according to Proctor, it requires an entire academic semester to teach such principles, they could not be explained by Proctor at the deposition. *Id.* Instead, Proctor pointed to OSHA regulations generally pertaining to safety requirements to prevent worker falls and other product safety matters, as well as to several academic textbooks on these subjects. Proctor Deposition at 21–24, 37. However, no specifics from these references were discussed by Proctor to justify his conclusion that the Model 3200 was "appropriately" designed.

Because Proctor was unable to articulate any engineering principles or methodology from these or any other sources as a basis for his opinion that the Model 3200 was not defectively designed, the court finds, under *Daubert's* standards, the reliability of Proctor's opinions insufficient on these issues. *See Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir.2000) ("failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony") (citing cases); *Rypkema v. Time Mfg. Co.*, 263 F.Supp.2d 687, 693 (S.D.N.Y.2003) (rejecting expert report "bereft of any engineering methodology … [or] … scientific basis … offered for the conclusion reached.") As such, Proctor's opinion that the Model 3200 design was "appropriate" and that Dreyer's negligence caused the accident amounts to a personal *"ipse dixit,"* unsupported by any reliable engineering principles or methods. *Kumho, supra,* at 157, 119 S.Ct. 1167 (a district court is not required to "admit opinion evidence that is connected to … [the case] only by the *ipse dixit* of the expert.") (quoting *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

Second, Proctor's opinions on these matters are inadmissible because the factual issues to which his findings are directed do not present issues requiring engineering or scientific expertise for their determination by the jury. Specifically, Proctor's assessment that Dreyer's failure to load the minivan rear-end-first in the No. 2 position prevented Dreyer from using the safe method of ingress and egress to a vehicle in such position available on the Model 3200, Proctor Report at 11, ¶ 1, 13, ¶¶ 7, 10–11, is in assertion of fact readily subject to jury consideration from the expected evidence in this case, including the deposition testimony of various experienced witnesses and observation of a video, Plaintiffs' Exhibit S, of a driver accessing a minivan loaded rear-end-first. Proctor also stressed that Dreyer's attempt to unload the minivan during adverse weather at the time of the accident, including "high wind gusts, heavy snow, rain, and icy conditions, and lightning was particularly unsafe," Proctor Deposition at 408–10, facts with which a jury is reasonably capable of evaluating without expert assistance. Additionally, Proctor found that Dreyer's actions in approaching the minivan from the rear, attempting to enter the minivan's driver's side door by stepping on the exposed portion of the hydraulic piston rod was particularly hazardous and demonstrated a failure to use reasonable care. Proctor Report at 13, ¶¶ 5, 6, 8, 9.

Proctor determined that if Dreyer had approached the minivan, properly loaded rear-end first, by using the available steps of the Model 3200's to climb to the head-ramp, Dreyer could have maintained the three-point stance in gaining entrance to the driver's side door of the minivan, thus reducing the risk of falling. Proctor Report at 13, ¶¶ 7, 10–11; [23] Proctor Deposi-

---

**23.** Although Proctor's Report does not direct-

ly state that had Dreyer been able to maintain

tion at 95. According to Proctor, Dreyer's decision to load the minivan front-end-first during the gusty wind conditions amounted to a lack of "reasonable care." Proctor Report at 13, ¶ 9. Proctor particularly found that Dreyer's failure "to use reasonable care" in using the piston as a foot support, a use for which it was not designed by Defendants, Proctor Deposition at 136, during the adverse weather conditions encountered by Dreyer also demonstrated Dreyer's disregard of his training. Proctor Report at 13, ¶ 8; Proctor Deposition at 97–100. As Proctor stated, "[it] is known to any reasonable adult that a rod [like the Model 3200's hydraulic piston] ... is a hazardous foot support." Proctor Report at 13, ¶ 8, Proctor Deposition at 410. Proctor therefore concluded that Dreyer's negligent actions in attempting to unload the minivan directly resulted from Dreyer's failure to "use common sense in evaluating the [weather] conditions," Proctor Deposition at 409, and Dreyer's lack of "good judgment." Proctor Deposition at 409–10.

In explaining the basis for his opinion that Dreyer's actions were lacking in reasonable care, i.e., common sense, Proctor alluded to "general guidelines" intended "to prevent an individual from working under inappropriate environmental conditions," Proctor Deposition at 408–09; however, no technical, engineering or regulatory sources are described by Proctor as providing any basis in the form of such "general guidelines" to find that Proctor's conclusions regarding Dreyer's asserted negligence are predicated upon any reliable scientific or engineering body of knowledge including authoritative "general guidelines." Nor does Proctor give any scientific or technical rationale for his "intellectual" and "practical understanding"

of autohauler "industry procedures," Proctor's alternative basis for his conclusion that Dreyer acted negligently. Proctor Deposition at 102. Hence, the court finds that Proctor's opinions on this issue are not based on reliable engineering theories or data, as required by *Daubert*. *Joiner*, 522 U.S. at 146, 118 S.Ct. 512 (insufficiency of studies relied upon by expert supported exclusion of opinions—court not required to accept expert's *ipse dixit* ); *Blanchard*, *supra*, at 316 (failure to review available sources of information relevant to issue and lack of adequate experimental basis for non-scientific opinion renders expert's opinion unreliable). Rather, the court finds that Proctor's findings and opinion that Dreyer acted negligently in the way Dreyer loaded and later tried to unload the minivan under the bad weather conditions prior to the accident, *i.e.*, loading the minivan front first, approaching it from the rear, attempting to enter the driver side door by stepping on the extended piston (a hazard apparent to any "reasonable adult"), and in failing to maintain a secure three-limb contact with the autohauler, present questions of fact for the jury that require no special degree of technical difficulty requiring the assistance of a qualified expert for their resolution.

As relevant, "common sense" is defined to mean "good judgment ... *not dependent on special or technical knowledge.*" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 459 (Merriam–Webster 1986 ed.) (underlining added). Courts have therefore excluded proposed expert testimony under Rule 702 where the resolution of the factual question involved in the case turned on an application of "common sense," the antithesis of expert knowledge. *See Dhillon v. Crown*

---

a three-point stance the accident would not have occurred, that conclusion is strongly implied. Proctor Deposition at 97 ("most likely

he [Dreyer] would not have fallen."). No technical support for that opinion appears in the record.

Controls Corporation, 269 F.3d 865, 871 (7th Cir.2001); *Reyes v. Delta Dallas Alpha Corp.*, 2000 WL 526851 *3 (S.D.N.Y. May 2, 2000); *Grdinich v. Bradlees*, 187 F.R.D. 77, 81–82 (S.D.N.Y.1999).

In *Dhillon*, the trial court excluded the proffered expert's opinion that a defendant's forklift truck was defectively designed because it lacked a rear door that conceivably could have prevented plaintiff's leg from falling out of the truck and being injured when the leg was caught between the forklift and a wall into which the forklift had collided. *Dhillon, supra*, at 871. Affirming the trial court's decision, the appellate court found that the expert's proposed testimony, that the proposed safety door could have prevented the plaintiff's injuries, involved a question of "common sense" for the jury to decide, and that such a matter was therefore not amenable to expert testimony. *Id.* As the Seventh Circuit stated, "[A]n expert ... must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the jury." *Id.* (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir.1998) (internal quotation marks omitted)). The court also observed that while the jury "could have been assisted by testimony on whether a rear door would have been economically feasible or safe in the case of a [forklift] tipover," *id.,* no such analysis had been performed by the expert in the case. *Id.*

In *Reyes*, the court found inadmissible a plaintiff's proposed expert's conclusions that plaintiff's injuries arose from a lack of supervision during the loading of a vessel, that an inadequate number of people were assigned to the task of loading an ice bin involved in plaintiff's injuries, and that the loading of stores for a vessel was the responsibility of the vessel operator. *Reyes, supra,* at *3. Specifically, the court held that, in reaching his conclusions, the expert relied not on objective industry standards as he had asserted, but upon "commonsense guidelines." The court found that the jury required no special training or experience to understand whether there was adequate supervision, whether loading the ice bin required more than one person, or to come to a conclusion on the question of responsibility for the loading process. *Id.* (citing *Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705, 708 (2d Cir.1989) (expert testimony is not admissible when it addresses "matters which a jury is capable of understanding and deciding without the expert's help.")).

In *Grdinich*, the trial court rejected expert testimony intended to advise the jury on the proper stacking of ironing boards in a retail store floor display which collapsed, injuring plaintiff, while plaintiff was attempting to remove a board from the display for purchase. *Grdinich, supra,* at 82. Excluding the testimony, the court found the expert had relied on "common-sense guidelines," not objective industry standards, that such "common-sense guidelines" were not a reliable basis for the expert's opinions, and therefore the proposed testimony failed to satisfy Rule 702's prerequisites for admissibility. *Id.* at 82.

Similarly, in the instant case, the record amply demonstrates that the jury will have little difficulty assessing whether and the extent to which Dreyer's failure to exercise common sense and good judgment, as Defendants' and Proctor have asserted, contributed to Dreyer's injury. Particularly, the exhibits submitted in support of Plaintiffs' motion, Plaintiffs' Exhibits A1—A16, together with the video (Plaintiffs' Exhibit S) demonstrating an alternative and, as Proctor opined and Defendants argue, the proper and safe means of access to the No. 2 position other than the one used by Dreyer, Dreyer's expected testimony, reports of the accident, and the probable testimony of Plaintiffs' and Defendants' lay

witnesses, who are knowledgeable and experienced, will be sufficient to permit the jury to determine any questions of Dreyer's failure to use "common sense" or "good judgment" in loading and attempting to unload the Astro minivan under the circumstances presented by this case.

For example, Defendant Delavan's vice president and general manager, Peter J. Terzian, Jr., provided an easily understood explanation of the hazards Dreyer faced when he attempted to gain access to the Astro minivan's driver side door by stepping on the extended piston with the minivan loaded front-end-first in the No. 2 position

"Any part of the [piston] cylinder you don't stand on [sic]. *It's like standing on a ketchup bottle* that you set down on the floor. You stand on it, its got *a round surface on it. You don't have any stability.*"

Terzian Deposition at 134–35 (underlining added). Alexander Faler, a driver trainer for Dreyer's employer, testified that his practice was to inform drivers not to attempt to unload vehicles from the Model 3200 headramp by approaching from the rear of the autohauler because it was unsafe to do so. Deposition of Alexander Faler, September 28, 2000 ("Faler Deposition") at 12. Presumably, Defendants intend to call Terzian and Faler as witnesses, or to offer their deposition testimony at trial. Proctor's own testimony that his assessment of Dreyer's negligence was based on the instruction Proctor and Dreyer received from Defendants on the proper operation of a Model 3200 reinforces the finding that Dreyer's negli-

gence, if any, can be determined without expert testimony. Proctor Deposition at 86–87, 89, 93. As discussed, Discussion, *supra*, at 426–29, Proctor's training and experience in the proper operation of a Model 3200 was too superficial to constitute sufficient degree of expertise in this subject. Thus, whether Dreyer deviated from his training, and thereby acted negligently, will not require expert testimony.[24]

Like the issues presented in *Dhillon, Reyes* and *Grdinich, supra*, the jury in the instant case will not benefit from Proctor's testimony, describing Dreyer's lack of common sense and bad judgment, in understanding the nature of the potential hazards, particularly the windy conditions, to which Dreyer exposed himself as he attempted to unload the Astro minivan. In evaluating the basis for Defendants' contentions that Dreyer's lack of reasonable care, in Proctor's opinion, negates Plaintiffs' claim of a product design defect and that Defendants' defense that Dreyer's negligence should preclude any award of damages, no technical explanation of coefficients of friction, or the force of wind upon persons working in elevated spaces, or the principles governing falling objects will be required to assist the jury's understanding of the evidence. The jury, as "reasonable adults," will instead apply their own "commonsense" understanding of the chance of a person of Dreyer's size slipping while stepping on a rounded, and likely, oily surface, for his footing particularly at an elevated level, the difficulty of maintaining balance when encountering windy conditions while maneuvering on a

---

**24.** Significantly, Proctor concluded that regardless of whether Dreyer's training condoned the procedures Dreyer utilized in loading and unloading the minivan, Dreyer "still did not use reasonable care." *Id.* at 93. Proctor and Defendants fail to explain the logic of how Dreyer was negligent because of his failure to abide by the loading and unload-

ing guidelines promulgated by his safety training if it is determined that such training condoned or accepted the precise manner of loading or unloading Proctor found to be negligent. As noted, Proctor testified that Dreyer's approach to the minivan was "not preferred" but "it is accepted." Facts, *supra*, at 422, n. 9 (citing Proctor Deposition at 95).

narrow and elevated surface without the benefit of a sturdy walking surface and handholds, and the law of gravity in considering Defendants' defense based on Dreyer's culpable and contributory negligence.

Proctor's unwillingness to consider alternative designs, as suggested by Plaintiffs, to improve the safety of drivers working on the Model 3200 headramp, provides additional support to the court's finding that Proctor's proffered testimony does not satisfy Rule 702's requirements. As discussed, Discussion, *supra*, at 436–37, Proctor testified that no engineering evaluation of the technical efficacy or cost-effectiveness of such alternative or additional safety features was necessary in this case because Dreyer's negligence in failing to properly load and his attempt to unload the Astro minivan under adverse conditions was the primary cause of the accident, displacing any need for such an evaluation. Proctor Deposition at 79–80 ("It was demonstrated that he [Dreyer] could have prevented this injury with the existing design so there was no reason to go any further, because there was no design defect.") Yet, the questions of whether such additional safety features could have prevented the fall and were technically feasible to have been installed on the Model 3200, from a design engineering viewpoint, are precisely the issues in the case upon which the jury would benefit from qualified expert testimony. *See Dhillon, supra*, 269 F.3d at 871.

Proctor rationalized his failure to consider alternative safety designs for the Model 3200 claiming that he had not been engaged by Defendants to make such an analysis. Proctor Deposition at 76–77. Proctor nevertheless admitted that good engineering practice called for the design of industry and commercial products to anticipate and prevent improper or negligent use, and that the Model 3200 had not been designed to prevent improper loading of a vehicle, *i.e.*, front-end-first, in the No. 2 position. Proctor Deposition at 400–01. Proctor explained that while he may previously have evaluated the feasibility of an extended walking surface for the Model 3200's hydraulic ramp piston system in a fully extended position, he did not do so for the purposes of this case. Proctor Deposition at 411–12.[25] Additionally, as previously noted, Defendants did not request Proctor perform such an evaluation. Proctor Deposition at 76. *See Dhillon, supra*, at 871 ("jury could have been assisted by testimony on whether a rear door would be economically feasible or safe in the case of tip-over," but proffered experts failed to follow "the proper analysis to allow them to provide such testimony.") Defendants' conscious avoidance of such an important issue in this product liability design case cannot shield Proctor's testimony from potential exclusion. In contrast, Plaintiffs' expert, Linda Weseman, provides a detailed explanation of how, in Ms. Weseman's opinion, alternative safety features could have been feasibly added to the Model 3200 such as telescoping covers for the ramp extending hydraulic pistons, extra hand holds, and hand rails in the Model 3200 headramp area. Weseman Report at 4–5.[26]

---

**25.** Defendants have not submitted anything to indicate Proctor has previously made any such evaluations.

**26.** Canadian manufactured autohaulers similar to the Model 3200 are equipped with handrails to prevent driver falls from the headramp. Ferguson Deposition at 16–17. Plaintiffs' Exhibit A–13, 14 and 15 depict, respectively, alternative safety devices installed on autohaulers similar to the Model 3200, *i.e.*, railings (A–13), covers for the extended piston (A–14), related to the No. 2 position, and a cable fence system (A–15) connected to the No. 1 position. Marcus Affidavit ¶ 15; Weseman Report at 5–6 (referring to handrails on autohaulers made by Defendant Delavan for use in Canada).

Defendants do not deny they were served with a copy of Weseman's Report prior to the preparation of Proctor's Report dated December 4, 2000. Proctor Report at 1; Proctor Deposition at 260 (Defendants stipulated that Weseman's Report was part of Dr. Proctor's file and that Proctor "has seen them" [*sic*]). Proctor testified that he had reviewed Weseman's "Supplemental" Report. Proctor Deposition at 50. In contrast to Proctor's Report and deposition testimony, Weseman's Report provided a detailed technical discussion of the potential additional safety features that could, in Ms. Weseman's opinion, have feasibly been added to the Model 3200 thereby lessening the possibility of a driver fall, as occurred in this case, from the headramp area. Weseman Report at 4–5. In seeking the admissibility of expert testimony, a party cannot avoid compliance with Rule 702 and *Daubert* by tailoring the witness's review of the issues amenable to expert testimony plainly raised by the claims or defenses in the case. *See, e.g., Dhillon, supra.*

Here, such potential changes to reduce the risk of driver falls from the Model 3200 headramp were irrelevant to Proctor and were therefore not evaluated by him because Defendants had not engaged him to do so, Proctor Deposition at 76, and Proctor had reached the *a priori* conclusion that Dreyer could have avoided injury by simply using the Model 3200 as he had been trained and with common sense. Proctor Deposition at 79–80. Proctor's failure to consider the availability, potential effectiveness, and feasibility of alternative safety features renders his evaluations of the Model 3200's design materially incomplete and therefore unreliable under *Daubert. Blanchard,* 207 F.Supp.2d at 315–17 (failure to employ same degree of intellectual rigor as used by other experts in field to opinions at issue supports a finding of unreliability). Here, Ms. Weseman, whose expertise is unchallenged by

Defendants, performed an evaluation of alternative designs. Weseman Report at 4–5. Proctor's unwillingness to do so therefore fails this test for reliability.

Although Proctor acknowledged that "good engineering practice" in the design of products requires consideration of foreseeable use, possible misuse, and potential abuse of a product by the intended user, Proctor Deposition at 27, because Proctor was of the opinion that the design of the Model 3200 was "appropriate," it was not necessary that he consider whether such good engineering practice had been applied by Defendant Delavan in its design of the Model 3200. *Id.* at 32. In fact, Proctor did not think it was necessary for him to examine the schematic diagram reflecting the actual design and specifications of the Model 3200, nor was it required that he make any measurements of the autohauler, or attempt to reconstruct the accident, as he was able to determine that the Model 3200 was safe as designed based only on his observation of the loading and unloading of an Astro minivan conducted by Defendants on November 20, 2000. Proctor Deposition at 42, 73–75. Assuming *arguendo* that Proctor's unspecific discussion of "good engineering practice" involves the application of accepted engineering design principles, Proctor Deposition at 115–16; 134–35, Proctor made no attempt to apply such practice to the design characteristics of the Model 3200 particularly those involving headramp safety issues. Therefore, Proctor's opinion that the design of the Model 3200 is "appropriate" is not the result of the application of objective and reliable engineering principles reliably applied. Fed.R.Evid. 702.

Indeed, Proctor testified, confusingly, that Dreyer's failure to use reasonable care did not mean that the Model 3200 was not defective, Proctor Deposition at 110

("Those [issues] are independent"). However, earlier in the deposition, Proctor stated that because Dreyer failed to properly use the existing design features of the Model 3200, it was not necessary for Proctor to examine further into whether the Model 3200 designers should have anticipated the specific use of the autohauler leading to Dreyer's injury because, as Proctor concluded, "there was *no* design defect." *Id.* at 80 (underlining added). In particular, Proctor testified that the hydraulic piston was not intended as a "foot support," Proctor Deposition at 136, but because Dreyer negligently used it as such, there was no defective design in the Model 3200 based on the Defendants' failure to anticipate such a reasonably foreseeable misuse. *Id.* at 154. Significantly, Proctor cites not engineering principles supporting such an assertion. Proctor's conclusion, that the Model 3200 was "appropriately" designed was therefore premised on Dreyer's culpable negligence in using the Model 3200. As such, Proctor's opinion is not predicated on any reliable engineering principles reliably applied to the facts of this case as required by Rule 702, and must therefore be excluded.

In further support of his findings regarding the Model 3200's "appropriate" design, Proctor asserted that the Model 3200 was properly designed because the "injury per exposure frequency rate" involving driver falls from the Model 3200 was one fall per 1.3 million driver "ingresses and egresses" as calculated by Proctor. Proctor Report at 12, ¶ 30. Defendants rely on this calculation as demonstrating a sufficient technical basis for Proctor's opinion that the Model 3200 was not defectively designed. Defendants' Memorandum at 7–8. Proctor also opined that Dreyer's capacity to exercise proper care in the Model 3200 loading and unloading features could have been adversely affect-

ed by medications Dreyer may have taken prior to the accident. Proctor Report at 14; Proctor Deposition at 424. As Proctor opined in his report, Dreyer "*may* have been susceptible to the influence of medications at the time of his fall." [27] Proctor Report at 14 (underlining added). Proctor's conclusion was in turn based on Dreyer's deposition testimony that Dreyer was "taking medications" and Proctor's review of information, obtained from the Internet, that indicated to Proctor that such medications would "influence the behavior" of the person taking them. Proctor Deposition at 418–19.

Defendants rely on Proctor's calculated "injury per exposure frequency rate" for the Model 3200 to demonstrate a scientific basis for Proctor's opinion that the Model 3200 was properly designed and argue that Proctor's opinion regarding the potential effect of Dreyer's medications should be admissible as evidence supporting Defendants' comparative negligence defense that Dreyer's actions were the cause of his fall. Defendants' Memorandum at 7–9. In particular, Defendants contend, without reference to any accepted engineering design or other principles, that it was reasonable for Defendant Delavan in designing the Model 3200 to "assume that the users will be free from the influence of narcotics that can affect judgment and balance." Defendants' Memorandum at 9. The court finds that Proctor's calculated "injury per exposure frequency rate" and his opinions regarding the effects of Dreyer's medications fail to meet Rule 702 and *Daubert* requirements.

Two reasons require exclusion of Proctor's opinion that the Model 3200 was properly designed because the "injury per exposure frequency rate" Proctor calculated was "trivial." Proctor Deposition at 293. First, Proctor provided no scientific

---

**27.** The parties do not dispute that Dreyer had taken the medications prior to the accident.

or engineering basis demonstrating that the "injury per exposure frequency rate" is a reliable indicator of a product's safe design. While detailing Proctor's method for calculating (one not appearing to require a high degree of mathematical sophistication) the "injury per exposure frequency rate," Proctor's Report and deposition testimony, are silent as to the scientific or engineering or other basis, such as a statistical one, for the concept, and provide no explanation of whether such a calculation is even generally accepted among product design professionals as a valid indicator of a product's safe design.

In his deposition, Proctor responded to Plaintiffs' question as to why the "injury exposure frequency rate" for the Model 3200 was "trivial," (implying the Model 3200 was properly designed) that his opinion was based on his "historical evaluation of injury data ... worldwide," Proctor Deposition at 292–93, and his "experience and evaluation." *Id.* at 293. Proctor also stated that he had "examined what OSHA considers to be injury frequency rates in industry," and that "one in one million, are remarkably small." [*sic* ] Proctor Deposition at 293. However, when asked to explain the nature and extent of his asserted "experience" regarding the significance of the "injury per exposure frequency rate," Proctor conceded that he could not "specifically recall the number [of "cases" or "files"], that he was referring to." Proctor Deposition at 305–06. When asked by Plaintiffs where the information supporting Proctor's claim that OSHA uses the "injury per exposure frequency rate" as a measure of product safety, Proctor responded that his assertion was "just my understanding of the industry in general." *Id.* at 293–94. Nor did Proctor make any further attempt to elucidate how such "ex-

perience and evaluation" demonstrates that his proffered "injury per exposure frequency rate," even assuming the completeness of its underlying accident data, is an accepted and reliable indicator of good and safe product design within the field of product design engineering.[28] *Id. (passim).*

Indeed, the court's research found no published caselaw making any reference to an "injury per exposure frequency rate," or including a discussion of any similar concept, as evidence, proposed or admitted, in connection with products liability litigation. The court's research also failed to reveal any reference to the "injury per exposure frequency rate" in any regulations promulgated by OSHA with respect to product safety or otherwise. Moreover, an expert may reasonably be expected to be able to articulate the nature and extent of any "experience and evaluation" relied upon to demonstrate that the "experience and evaluation" is a reliable basis for the proffered opinion. As such, the court finds the "injury per exposure frequency rate" and Proctor's characterization of the rate for the Model 3200 as "trivial," offered to support Proctor's conclusion that the Model 3200 did not suffer from a defective design relative to the risks to driver safety, constitutes "unscientific speculation," *Cummins v. Lyle Industries,* 93 F.3d at 367, (quoting *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.) *cert. denied,* 519 U.S. 819, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996)), excludable for lack of any reliable technical or scientific basis. *Id.* (under *Daubert* court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific"). Unsupported by any relevant and generally accepted technical authorities, Proctor's

28. The fact that an accident has not occurred in a million operations of a mechanical device does not logically compel the conclusion that in the particular case the cause of the accident, once revealed, is not a design defect that should have been reasonably foreseen.

proposed testimony as to the safe design of the Model 3200 based on the "injury per exposure frequency rate" he calculated for the Model 3200 constitutes a conclusory personal opinion lacking in "good grounds" for its admissibility as required by *Daubert*. *Daubert, supra,* at 590, 113 S.Ct. 2786; *Rypkema, supra,* at 693. In substance, on this element of Proctor's opinion, the court is asked to take Proctor's "word for it," an acceptance foreclosed by *Daubert* and *Kumho.*

Second, even if Proctor's "injury per exposure frequency rate" were shown to be grounded upon scientific or engineering methods or principles, or other indicia of technical reliability as a generally accepted indicator of product safety, Proctor's opinion, based on the "injury per exposure frequency rate," is nevertheless inadmissible under Rule 702 for lack of a reliable foundation. Proctor testified that his calculation was based on accident data derived from Defendants' records of driver falls from the Model 3200, and his estimated driver ingresses and egresses from the Model 3200 No. 2 position, for the period 1988 through 1993 which he received from Defendants. Proctor Report at 12, ¶ 3; Proctor Deposition 277–82.[29] Proctor admitted that while he believed the data were complete, he had no first-hand knowledge of such fact and had accepted the data that had been garnered by Mr. Silber, Defendants' consultant, Proctor Deposition at 281, without verifying its accuracy because he *"relied on* Mr. Silber for this information." *Id.* at 280 (underlying added). However, Rule 702 requires that an expert's opinion be "based upon sufficient ... data." Fed.R.Evid. 702. Where an expert fails to verify the accuracy of data upon which the expert creates a statistical analysis or renders an opinion, the resultant analysis and opinion are inherently unscientific requiring exclusion of such evidence under *Daubert. Rowe Entertainment, Inc. v. William Morris Agency, Inc.,* 2003 WL 22124991 *9 (S.D.N.Y.Sep't.15, 2003) (excluding expert's testimony where expert "took no steps to clarify the accuracy of the data plaintiffs provided to him"); *Freeport–McMoran Resource Partners Ltd. Partnership v. B–B Paint Corp.,* 56 F.Supp.2d 823, 833 (E.D.Mich.1999) (unverified facts underlying challenged expert opinion required exclusion of expert testimony).

Here, Proctor admittedly obtained the underlying accident data from a staff member in Defendants' attorney's office who obtained the information from Defendants' consultant, and Proctor made no effort to independently verify the accuracy of the data. Proctor Deposition at 279–80. As Proctor's calculation of the "injury per exposure frequency rate," and his opinion that its "trivial" nature demonstrates the Model 3200 is not defectively designed, is founded upon unverified and therefore potentially incomplete and inaccurate data, it is inadmissible for lack of compliance with Rule 702's requirement that data upon which a proposed expert's testimony is based be "sufficient." Fed.R.Evid. 702. "An analysis is only as good as the data upon which it rest[s]" and "'it is important to verify the accuracy of the data collection.'" *Rowe Entertainment, Inc., supra,* at *4 (quoting Federal Judicial Center, Reference Manual on Statistics 90 (2d ed.2000)). Data relied upon by an expert as the basis for an opinion that is neither verified as to its accuracy and completeness or, if from a recognized source, is "speculative in nature and therefore inherently insufficient," should be excluded. *Rowe Entertainment, Inc., supra,* at *9 (quoting *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir. 1996)). Notably, Defendants do not sug-

---

**29.** Proctor testified the data covered the peri-   od 1989 to 1993. Proctor Deposition at 263.

gest that the underlying data was prepared by Defendants in the ordinary course of business or for the purpose of meeting reporting requirements in compliance with government regulations which could provide some indicia of reliability for the data. In this case, the risk that the underlying accident data is not sufficiently reliable is heightened · by the fact that its source was a paid consultant of Defendants whose own credentials and data gathering methods are not described in the record. Accordingly, Proctor's calculation and reliance upon the "injury per exposure frequency rate," as indicative of the absence of a design defect in the Model 3200, is excluded on this ground.

As discussed, Discussion, *supra*, at 444–45, Proctor's Report also included Proctor's conclusion that as Dreyer had taken prescription medications such medications, according to Proctor, could have impaired Dreyer's mental and physical capacity to safely unload the Astro minivan particularly under adverse conditions. Proctor Report at 14; Proctor Deposition at 424. Despite the obvious prejudice of this assertion to Plaintiffs' case, Proctor conceded that he had not conclusively determined that Dreyer's use of Depakote and Ritalin, antiseizure and attention disorder medications, respectively, had caused Dreyer to fall and Proctor, nevertheless,

opined that "Dreyer *may have been susceptible to the influence of medication at the time of fall.*" Proctor Deposition at 424 (underlining added). Moreover, Proctor also admitted that his understanding of the side effects of such medications, such as drowsiness or dizziness, Proctor Report Appendix 4 at 31, 33, was based on information he obtained from an Internet source describing potential side effects of Dreyer's medications, yet Proctor was not trained in pharmacology and therefore could not say with any degree of certainty that Dreyer in fact experienced such adverse side effects at the time of his fall.[30] Proctor Deposition at 420, 422. Asked specifically to state "what adverse side affects [*sic*] Mr. Dreyer was under the influence of at the time of his accident," Proctor responded that "I cannot," because he did not know. *Id.* at 422. Proctor also admitted he was unaware if Dreyer's medications carried warnings against operating motor vehicle machinery or working at heights while taking the medications. Proctor Deposition at 425.[31]

Further, because Proctor conceded his lack of expertise regarding the potential for side effects that could have adversely affected Dreyer at the time of the accident, Proctor's reliance upon the hearsay Internet sources for such information is not

---

**30.** Although Proctor asserted that his belief that Dreyer "may or may not" have been affected by the medications prior to his fall was based on a "reasonable degree of engineering certainty," Proctor Deposition at 423, how the question of the physiological effect of specific medications upon a person using them while operating an autohauler is subject to an engineering evaluation was not explained by Proctor and appears to be at odds with his admission that he lacks any expertise in regard to medicine or pharmacology. Proctor did assert that his opinion of the potential effects of use of such upon Dreyer's unloading actions were based on Proctor's "experience." However, no elaboration of

the nature of such experience as a reliable basis for Proctor's opinion on this subject was provided by Proctor or Defendants.

**31.** A cursory reading of the printouts regarding the medications submitted by Proctor as part of his report reveal no such cautions for Ritalin. Proctor Report Appendix 4 at 31–32. As to Depakote, the information states only that if drowsiness occurs, the patient should refrain from operating motor vehicles until the dizziness subsides. *Id.* at 33. Neither Proctor's Report nor the record indicate how long Dreyer had been taking the medications prior to the accident or whether Dreyer admitted to experiencing dizziness at that time.

authorized by Fed.R.Evid. 703, as the rule permits reliance upon inadmissible evidence only if of a type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. Here, Proctor is admittedly not an expert on such matters, and Defendants make no showing that a qualified expert on the side effects of the medications at issue would rely upon the sources utilized by Proctor. Accordingly, the court finds that as Proctor does not possess any specialized "knowledge, skill, experience, training or education" sufficient to qualify him as an expert on this issue, neither his Report nor testimony is supported by sufficient data, required by Rule 702, on the potential adverse physical effects from Dreyer's medications at the time of the accident relating to the cause of the accident and Dreyer's responsibility for it.

Proctor also testified that potential adverse effects from Dreyer's medications could place Dreyer outside the "standard design conditions for a device" like the Model 3200. *Id.* at 424. However, neither in Proctor's Report nor his deposition testimony does Proctor describe or explain the technical aspects of such "standard design conditions," their source or acceptance in the field of design or mechanical engineering, or how they might apply to the issues for the jury in this case. Based on Proctor's concession that he could not determine with reasonable certainty that Dreyer's medications in fact adversely affected Dreyer and contributed to his fall, the court finds Proctor's proposed testimony on this rationale for rebutting Plaintiffs' claimed design defect and Proctor's alleged negligence also lacks "sufficient facts or data" for its support as required by Rule 702.

Because Proctor's proposed opinion and testimony concerning any causal relationship between Dreyer's use of medications and his injuries constitutes unsupported speculation offered by a proposed expert on a subject outside his field of claimed expertise, the court also finds any probative value of the testimony to be outweighed by its potential to unduly prejudice or mislead the jury regarding the relevant issue. Fed.R.Evid. 403. *United States v. Cruz,* 363 F.3d 187, 194 (2d Cir. 2004) (testimony that "strays from expert's scope of expertise violates Rule 403"); *Dukagjini,* 326 F.3d at 54 (risk of juror confusion based on mingling expert's knowledge of facts with expertise requires exclusion under Rule 403); *Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 48 n. 2 (2d Cir.1984) (expert testimony lacking any scientific basis and, alternatively, unsupported by record properly excluded pursuant to Rule 403); *Bonton v. City of New York,* 2004 WL 2453603 *4 (S.D.N.Y. Nov.3, 2004) (expert's unsupported speculation regarding actual cause for disparate placing of African–American children in foster care excluded as unduly confusing to jury without probative effect pursuant to Rule 403). To permit a witness not qualified as an expert on a highly technical issue, involving the interactions between prescription drugs and the user's conduct, to speculate about such effects carries a high risk of misleading the jury into believing that the opinion was accurate and reliable, which is manifestly not the case here. *Bonton, supra.*

In sum, the court finds that despite his many credentials Proctor is not qualified to testify on the issues presented in this case. Even if he was qualified, the court determines that Proctor's testimony that Dreyer's own negligence was the actual cause of Dreyer's fall from the Model 3200 headramp is irrelevant to the issue of Plaintiffs' allegations that the Model 3200 was defectively designed. Although relevant to Defendants' comparative negligence defense, as such testimony is predi-

cated upon the application of common sense, given the evidence in this case, the testimony is not required to assist the jury in understanding or deciding these issues. Finally, to the extent that Proctor's opinion purports to assert the safe design of the Model 3200 and the actual reason for Dreyer's fall, issues upon which the jury could benefit from expert testimony, Proctor's Report and opinions do not meet the minimum standards for technical reliability established by Rule 702 and *Daubert.* Additionally, Proctor's opinion regarding Dreyer's negligence based on use of prescription medications in causing the accident violates Rule 403. Therefore, Defendants have failed to meet their burden under Fed.R.Evid. 104(a) that Proctor's Report and testimony are admissible pursuant to Rule 702.

## CONCLUSION

Based on the foregoing, Plaintiffs' motion to exclude (Doc. No. 92) is GRANTED. SO ORDERED.